FARRAR *et al. v.* SOUTHWESTERN RAILROAD COMPANY,

and *vice versa.*

1. The Federal court which administered the assets of the Central Railroad & Banking Company through a receivership thereof did not treat its lease of the property of the Southwestern Railroad Company as being of force and effectual during the entire period of the litigation.
2. The lease contract of 1869 between the Central Railroad & Banking Company and the Southwestern Railroad Company was, in effect, practically abrogated during at least a portion of the time that litigation was in progress.

3. If the stockholders of the latter company were in their own right entitled to any portion of the fund paid by the Central of Georgia Railway Company to it in settlement of its demand for " back rentals," no stockholder's claim on this account in any event exceeded five per cent. upon the amount of his capital stock, and a stockholder who received this much of that fund can not maintain against his company an action for more of it.

4. Even if a stockholder who had received none of this fund had a right of action against the company, the same became barred under the four years statute of limitations.

Argued July 7, — Decided August 9, 1902.

Equitable petition. Before DuPont Guerry, judge pro hac vice. Bibb superior court. September 16, 1901.

*Henry A. Alexander,* for plaintiffs. *Adams, Freeman, Denmark & Adams* and *Hardeman, Davis, Turner & Jones,* for defendant.

LUMPKIN, P. J.    In the year 1869 the Southwestern Railroad Company, hereinafter called the " Southwestern company," under legislative authority leased its railroad to the Central Railroad & Banking Company, hereinafter called the " Central company." By the terms of the contract the lessee was to pay to the stockholders of the lessor a semi-annual dividend upon their stock of 3 1/2 per cent., these dividends being due in June and December of each year. They were regularly paid up to and including the month of June, 1892. Previously, on the 3d day of March, 1892, the property of the Central company had, upon a bill filed against it and others in the United States court by Rowena M. Clarke and others, been placed in the hands of E. P. Alexander as temporary receiver. Later, what is termed a dependent bill was filed by this company against the Farmers' Loan & Trust Co. and others ; and finally all of the property of the Central company passed into the hands of H. M. Comer and R. Somers Hayes as permanent receivers, to be administered under the bill last mentioned. The latter was appointed receiver in October, 1893. This receivership terminated on the 31st day of October, 1895. No payments of dividends were made by the receivers to the stockholders of the Southwestern company after June, 1892.

On January 19, 1893, H. M. Comer as receiver, under an order of court and for the purpose of securing the payment of a certain sum of money which he was authorized to borrow in order to carry on the business with which he had been entrusted, pledged to the Mercantile Trust Company various assets of the Central company,

including the "leasehold interest" it had held in the property of
the Southwestern company. On June 30, 1893, the court passed
an order of which the following is a copy: "Ordered that the re-
ceiver of this court shall, as soon as practical, make a report on the
following corporations whose properties are under lease to the Cen-
tral Railroad and Banking Company of Georgia, to wit: the South-
western Railroad Company, the Augusta & Savannah Railroad Com-
pany, the Mobile & Girard Railroad Company, the Eatonton
Branch Railroad; which report shall show the amount of earnings
which have come into the hands of the receivers from the operation
of the said leased lines from March 4th, 1892, to date, or as near
thereto as practicable; and shall also show the amount of expenses
incurred by him in the operation of the same, and the amount of
the disbursements for their account during the same period. The
receiver shall also furnish to the said corporations a copy of this
order. Within thirty days from the receipt of the said communi-
cation by the respective corporations, the said corporations shall
make known to the receiver and to this court whether they desire
to permit said properties to remain in the hands of the said receiver
as representing the lessee company, with the right on the part of
the said corporations or either of them to claim the net results of
the operation of their respective properties, up to the rental con-
tract but not beyond, or whether the said respective corporations
shall receive from the receiver the surrender of the leasehold inter-
ests held by him as receiver of the Central Railroad and Banking
Company of Georgia. Should any of the said companies make
known their option to receive the surrender of the leasehold inter-
est as aforesaid, the said receiver shall immediately apply to this
court, or to one of the judges thereof, for an order authorizing and
directing him to surrender the same. Should any of the said com-
panies elect to permit the leasehold interest to remain in the hands
of the receiver, said companies shall have the right to claim from
this court the net results of the operations of their properties by the
receiver, up to the rental contract price and no more, unless the
receiver should, under order of the court, elect to retain the lease-
hold interest and to pay therefor the rental contract price." The
action taken by the directors of the Southwestern company with
respect to this order will be gathered from the following extract from
a report made by its president to the stockholders: "In view of the

fact that the surrender of the road without shops or rolling-stock would involve an immediate large expenditure that the company was not prepared to make, it was deemed advisable to permit the receiver of the Central to continue, for the present, to operate the road for account of the company, not because we desired it, but because we were practically helpless to do otherwise, and the so-called option was, or at least had all the force of, a mandate."

Comer, the receiver, and his associate, Hayes, continued to oper-ate the railroad of the Southwestern company until, under a plan of reorganization approved by the court, the Central of Georgia Rail-way Company, hereinafter referred to as the "new Central com-pany," became the owner of the lines of railroad and other prop-erties of the Central company. Before the reorganization took place, the receivers, under the order and approval of the court, sold the assets pledged as above stated. The Mercantile Trust Com-pany was the purchaser, and the proceeds of this sale were credited upon the debt which these assets had been pledged to secure. The plan of reorganization, to which the Southwestern company was a party, embraced the following stipulation: "The new company will obtain new leases of the Southwestern and Augusta & Savan-nah railroads at a rental of 5% upon their respective capital stocks. Any arrears of rental due to these railroad companies, respectively, shall be adjusted on this basis." In a contract between the South-western company and Samuel Thomas and Thomas F. Ryan it was among other things agreed that these men were to purchase all the "railroads and property" of the Central company, organize the new company, and deliver to it all that was so purchased; and that to this company the Southwestern company would lease its railroad under a contract similar to that made in 1869 with the Central company, except that the rental was to be upon the basis of five per cent. per annum instead of seven, and was to be payable to the Southwestern company as a corporation and not directly to its stock-holders. In the contract between this company and Thomas and Ryan was a stipulation in these words: "Said purchasers will cause to be paid to the said Southwestern Railroad Company, through R. T. Wilson, its president, the rentals in arrears due the Southwest-ern Railroad Company under the existing lease from July first, eighteen hundred and ninety-two, up to the date of the execution and delivery of the new lease herein provided for, at the rate of five-

per cent. per annum, such rental to be paid in cash out of the proceeds of the issue of sixteen million, five hundred thousand dollars consolidated 50-year gold bonds, but it being agreed that there shall be credited on account of such rental whatever the Southwestern Railroad Company shall have received or may hereafter receive from the receivers on account of the rental or operation of said road accruing from and after July first, eighteen hundred and ninety-two, not including any amount spent upon the road or in its operations or improvements." These arrangements were all carried into effect, and on November 1, 1895, the court passed an order containing the following: "The Central of Georgia Railway Company hereby agrees and binds itself, on or before December 15, 1895, to fully pay and discharge any balance due of the arrears of rental, calculated on the basis of five per cent. on the capital stock of said Southwestern Railroad Company, deducting the payment herein stated, made and to be made; and upon the failure to make such payment on or before the date last aforesaid, the Southwestern Railroad Company shall be at liberty to apply to the court, on five days notice, for such summary order requiring the said Central of Georgia Railway Company to pay over such balance due prior to January 1, 1896." Immediately following the words just quoted, the order ran thus: "It is further ordered that the receivers of this court are hereby directed and authorized to turn over and deliver to the said Central of Georgia Railway Company, at midnight on October 31st, 1895, the possession of all the railroad and property of said Southwestern Railroad Company now in their possession as officers of this court. The said Central of Georgia Railway Company accepting such possession subject to the orders of this court requiring it to complete the payment of such back-due rental on or before the date hereinbefore stated." Subsequently the new Central company paid over to the Southwestern company the sum of $865,183.34, this being five per cent. per annum upon the capital stock of the Southwestern company during the period of default herein indicated. This company out of this sum paid about $265,000.00 in settlement of various charges and expenses incident to the litigation; and on December 24, 1895, declared a dividend of ten per cent. payable to the stockholders of record on that date. The gross sum received was thus reduced to about $90,000.00, which was set apart as a "sinking" fund and so invested that it now amounts to something more than $100,000.00.

On July 18, 1899, R. M. Farrar filed against the Southwestern company, in the superior court of Bibb county, a petition in which it is alleged that he "is the holder of an instrument of assignment by which the present owner of" specified certificates of stock issued by the Southwestern company "heretofore transferred, set over, and assigned to petitioner all his right, title, and interest in and to whatever sums of money he might be entitled to by virtue of his ownership of said shares of stock in the Southwestern Railroad Company and not collected by him up to the date of assignment, except such dividends as might be declared on said stock after June 1st, 1899." To this petition there were several amendments, and the whole set forth, in substance, the facts above stated. The plaintiff in his original petition prayed for a judgment declaring that the fund received by the Southwestern company from the new Central company belonged to the stockholders of the former "at the time said fund should have been received by them under the terms of the lease of 1869," and for a distribution thereof accordingly. One of the amendments contained a prayer in these words: "That the execution of the decree for the return to its true owners of all that part of the fund received in compromise of defaulted rentals, except the sinking fund and the income subsequently received from it which is now in the possession of the defendant company, be suspended and stayed by the court until such time when the said company shall have had a full opportunity to recoup itself against those whose conduct subjected it to this liability; it being the desire and purpose of petitioner to hold this action, except so far as it concerns the sinking fund and the income derived therefrom, in subjection to the wishes of the present stockholders of the defendant." Practically, then, the action was for the distribution of the sinking fund and for the recovery of Farrar's alleged interest therein.

Several other persons were upon their own application made parties plaintiff. The petition was on demurrer dismissed as to all of them, and they are here excepting to this action of the court.

1. As will have been perceived, the theory of the original plaintiff was that the large fund received from the new Central company all belonged to the persons who were stockholders of the Southwestern company at the end of each six months when the dividends would have been payable under the old lease; that the

Southwestern company had no right to one dollar of this fund; that it accordingly received the money in trust for the alleged owners, and was therefore liable to them for the same. It was urged in the argument here that "The lease contract of 1869 was continuously in existence during the receivership of the Central railroad, and ceased to exist only upon the execution of the amended lease of 1895." In support of this contention it was insisted that the hypothecation and sale of the "leasehold interest" under the order of the United States court to the Mercantile Trust Company necessarily showed that the court regarded the lease contract as being in existence and of force all the while. In this view we do not concur. The assets of the Central company were pledged before the order of June 30, 1893, of which we shall presently have more to say. The pledgee, in so far as the "leasehold interest" was concerned, took no more than a bare equity subject to the chances of the pending litigation; and before the sale of that interest occurred, the character of that equity had been fixed by the order last mentioned, and it was, because of that order, either valueless in the hands of the purchaser, the Mercantile Trust Company, or else that company and its final successor in ownership, the new Central company, acquired the right to whatever the owner of the equity was entitled to receive. Neither of these alternatives would be helpful to the plaintiffs in error. There are, it must be admitted, expressions in several of the documents copied above and in others appearing in the record which tend strongly to support the contention that the "leasehold interest" was continuously of force throughout the litigation; but these expressions can not, in our judgment, do away with the positive terms of the order of June 30, 1893.

2. The effect of that order was to practically abrogate the original lease, at least from the time the Southwestern company elected to allow its property to remain in the hands of Comer as receiver. Certainly, from that time to the end, neither the Southwestern company nor its stockholders could demand the seven per cent. per annum, or, indeed, anything under the old lease contract. Undoubtedly, we think, it was no longer operative or effectual, but the company, by allowing its property to remain in the hands of the receiver, did obtain "the right to claim from [the] court the net results of the operation" of its property. This right was clearly given to the company and not the stockholders.

3. In so far, then, as that portion of the $865,183.34 which sprang from the "net results" of the operation of the railroad of the Southwestern company after the order of June 30, 1893, became effective, is concerned, we are quite clear that the same was properly paid to the company and that it had the right to dispose of it as a corporate fund. If the amount of the two dividends which would have accrued in December, 1892, and June, 1893, under the old lease (making both together, by the terms of the contract, seven per cent., and which amount was by the settlement adjusted upon the basis of five per cent.), does in equity belong to those who were stockholders during these months, no person who was such a stockholder can claim his share of that amount if he has already received out of the gross fund a sum equal to or greater than five per cent. upon his stock. Counsel for Farrar conceded that his petition, properly interpreted, showed that his assignor did receive the ten per cent. dividend declared December 24, 1895. This being so, that petition, in our judgment, utterly failed to set forth any cause of action against the defendant. His counsel relied earnestly upon the decision of this court in the case of *Meldrim* v. *Trustees*, 100 *Ga.* 479. That decision is by no means controlling in the case before us, for the reason that the court did not, in rendering it, pass upon the main question upon which Farrar's alleged right of action depends. While some of the expressions used by the Chief Justice, who delivered the opinion, indicate the contrary, it is nevertheless true that the court was not called upon to construe the order of June 30, 1893, and did not undertake to decide what effect should be given to it. On the other hand, that case was decided upon the agreed statement of facts which the parties thereto submitted to the court below. Neither side contended that the receiver did not, in point of fact, continue to operate the railroad of the Southwestern company under the original lease of 1869; but, in the agreed statement of facts just referred to, which constitutes a part of the transcript of the record of that case of file in this court, it was conceded " that the consideration money under said lease was due from July 1st, 1892, to November 1st, 1895, the date when the lease contract between the Southwestern Railroad Company and the Central of Georgia Railway Company became effective, a period of three (3) years and four (4) months." In other words, the lease of 1869 was treated as being operative

during the entire period of the receivership. The order of June 30, 1893, was not mentioned in this agreed statement of facts or alluded to in the pleadings, nor did it constitute a part of the record transmitted to this court. Indeed, we are by the record in the present case for the first time informed as to the contents of that order and its effect, which was, as above pointed out, to practically abrogate the original contract of lease made in 1869, at least from the time the Southwestern company elected to allow its property to remain in the hands of Comer, as receiver, under the terms and conditions in that order specified.

4. As to the persons who were made parties plaintiff while the case was pending, it is sufficient to say that their right of action, if any they had, was barred by the statute of limitations. They were not made parties till November 14, 1901, which date is, of course, that upon which the action as to them began, and it was about six years after the Southwestern company received the fund in controversy. The four years bar applies. The written contract of lease between the Central company and the Southwestern company was in no sense a contract between the latter company and its stockholders, and it certainly embraced no promise by that company to pay them anything. The fact that this contract provided that the Southwestern company should maintain during the lease its corporate organization "to the fullest extent necessary to preserve its charter and protect the rights of its stockholders" does not, as contended, amount to a covenant under seal which brings this case within the twenty years limitation. The ten years limitation provided for in the Civil Code, § 3772, applies to technical trusts, and not to a case like the present. *Southern Star Co.* v. *Cleghorn*, 59 *Ga.* 782; *Schofield* v. *Woolley*, 98 *Ga.* 548; *Tiedeman* v. *Imperial Fertilizer Co.*, 109 *Ga.* 661; *Teasley* v. *Bradley*, 110 *Ga.* 498, 504. Moreover, the Southwestern company was not undertaking to act as trustee for the stockholders with respect to the fund it received from the new Central company for the "back rentals." According to the petition, the defendant immediately set up the claim that the money was its own, and from the beginning held it adversely to the stockholders. If this fund really belonged to them, it was simply the case of an agent collecting money for his principal and keeping it. This being so, the suit should have been begun within four years from the time the adverse claim

was, with the knowledge of the stockholders, set up.    The petition does not show that any of the plaintiffs were ignorant of the position which the company took with reference to this fund at the very beginning.    Taking their allegations all together, it is quite clear that they fully understood the situation.    The ground of the demurrer presenting the point that all of the plaintiffs except Farrar were barred was therefore well taken.

*Judgment on main bill of exceptions affirmed; cross-bill of exceptions dismissed.    All the Justices concurring, except Lewis J., absent, and Fish, J., disqualified.*