PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.

(Circuit Court of Appeals, Second Circuit.   July 18, 1912.   On Petition for Rehearing October 16, 1912.)

Nos. 233, 194, 161, 236, 237, 240, 234.

**1. RECEIVERS (§§ 1, 65\*)—NATURE AND PURPOSE OF REMEDY—EFFECT OF APPOINTMENT—"CHANCERY RECEIVER."**

A "chancery receiver" is an indifferent person, appointed to hold property in litigation pending suit, who derives his authority from the court, and not from the parties, at whose instance he is appointed.  He acts in behalf of no particular interest, but guards the rights of all, and, being a mere holder, his appointment does not change the title to the property in his charge, nor affect any lien.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 1, 114, 115; Dec. Dig. §§ 1, 65.\*]

**2. STREET RAILROADS (§ 58\*)—RECEIVER FOR LEASEHOLD—RIGHTS AND DUTIES.**

When a court appoints a receiver of the property of a railroad company, which embraces a leasehold estate, it is his duty to take possession of it; but he does not by such act become assignee of the term, and is under no obligation to adopt the company's contracts.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.\*]

**3. STREET RAILROADS (§ 58\*)—RECEIVER FOR LEASEHOLD—ADOPTION OF LEASE.**

If a receiver elects to adopt a lease, he becomes vested with the title to the leasehold interest, and a privity of estate is thereby created between the lessor and him, by which he becomes liable upon the covenant to pay rent; but unless and until he does adopt a lease there is no such privity, and no liability upon the lease, and he is entitled to a reasonable time after taking possession in which to decide whether the interests of his trust will be better subserved by making the lease his own or by returning the property to the lessor.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.\*]

**4. STREET RAILROADS (§ 58\*)—RAILROAD RECEIVERS—PROVISIONAL OPERATION OF LEASED PROPERTY—RENT.**

A receiver for a lessee railroad corporation, by provisionally operating the leased road, does not thereby become bound to pay rent for the trial period at the rate stipulated in the lease, in case he elects to renounce it, but, in the absence of special equities, cannot be required to do more than to turn over the net earnings to the lessor; and this rule being based on the lessor's acquiescence, in that the receiver, in performing the duties which it owes to the public and protecting its franchise, is operating the road to a large extent for its benefit, it may also be charged with the deficit, where the operation results in an actual loss.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.\*]

**5. STREET RAILROADS (§ 58\*)—RECEIVERS—LOSSES IN OPERATION—LIABILITY AS BETWEEN LESSOR AND LESSEE.**

The Metropolitan Street Railway Company, by purchase, consolidation, and lease, acquired control of substantially all of the street railroad lines in New York City, which it operated as a unitary system and subsequently leased for long term to the New York City Railway Company, which previously owned and operated a small line.  The City Company assumed payment of rentals and interest on underlying mortgages of the subsidiary and lesser companies.  The City Company became insolvent.

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and receivers were appointed in a creditors' suit, and a week later the Metropolitan Company became a party, and on its application the same receivership was extended to its interests in the property. The joint receivers operated the property for a number of months at a large loss, caused by their payment from cash and quick assets belonging to the City Company of rents, interest on underlying mortgages, and for improvements and betterments necessary to keep up the service and to keep the system together. The receivers renounced the lease of the City Company, and on separation of the receiverships the receiver for the City Company surrendered the property to the Metropolitan receivers. *Held*, that such losses in operation, having been caused by disbursements which inured only to the benefit of the Metropolitan Company, should be charged to that company, and that the receiver for the City Company was entitled to recover from the Metropolitan receivers the funds of his trust which were so expended.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

6. CORPORATIONS (§ 565*)—INSOLVENCY AND RECEIVERS—DISTRIBUTION OF ESTATE—PROVABLE CLAIMS.

A court of equity, in prescribing what claims shall take in the distribution of the estate of an insolvent corporation, being administered through a receiver, must regard on the one hand the substantial right of all creditors to share in their debtors' property, and on the other the necessity for expeditious administration, and, giving due consideration to both, must make rules which are practicable as well as equitable. In so doing, without regard to whether claims are (1) past due, (2) immature, or (3) contingent, they may be divided with respect to the question of provability into two classes: (1) Claims of which the worth or amount can be determined by recognized methods of computation at a time consistent with the expeditious settlement of the estate; (2) claims which are so uncertain that their worth cannot be so ascertained. All claims of the first class may be proved, but those of the second class cannot be, because, while they may be meritorious, their amounts cannot be ascertained. The time at which the status of claims shall be fixed is not necessarily the date of the appointment of the receiver; but the rule should be that claims which, when presented within the time limited by the court for their presentation, are certain or are capable of being made certain by recognized methods of computation, should be allowed.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*]

7. CORPORATIONS (§ 565*)—RECEIVERS—CLAIMS—ANTICIPATORY BREACH OF CONTRACT—APPOINTMENT OF RECEIVER.

Where one party to an executory contract puts it out of his own power to perform it, there is an anticipatory breach, which gives the other party an immediate right of action for the damages which he sustains thereby; and where one party is a corporation, its insolvency and the appointment of a receiver, who refuses to further perform, is such a disablement, and the breach dates from the receiver's appointment.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*]

8. DAMAGES (§§ 40, 176*)—BREACH OF CONTRACT—LOSS OF PROFITS—EVIDENCE.

Gains prevented, when fairly shown, are recoverable as damages for breach of a continuing contract; and as future gains must be measured by past performance, profits made under the contract for a reasonable period before the breach may be shown to establish gains prevented thereby.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 72–88, 461, 468, 471, 493; Dec. Dig. §§ 40, 176.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. CORPORATIONS (§ 565*)—INSOLVENCY AND RECEIVERS—DISTRIBUTION OF
ASSETS—PROVABLE CLAIMS—BREACH OF EXECUTORY CONTRACT.

A street railroad company, operating an extension system, made a con-
tract by which it granted to claimant, an express company, the right to
conduct an express business over its lines for a term of 20 years, and
agreed to furnish cars therefor for a percentage of the gross receipts.
It afterward leased its lines, and the lessee assumed the contract. Claim-
ant later assigned the contract, as permitted by its terms, to another
company, financially responsible, which agreed to pay claimant $10,000
per year during the remainder of the term. Both railroad companies
became insolvent, and receivers were appointed with their consent, who
renounced and refused to further perform the contract. *Held*, that there
was a breach of the contract, from which claimant suffered substantial
damages, for which it was entitled to prove a claim against the insol-
vent estates; the amount of damages being a matter of proof.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282;
Dec. Dig. § 565.*]

10. CONTRACTS (§ 187*)—RIGHT OF ACTION FOR BREACH—PROMISE FOR BENEFIT
OF THIRD PERSON.

By the general American rule a third person may sue on a promise
made to another for his benefit; but it is essential to such right that he
be the real promisee, that the promise be made to him in fact, though
not in form. It is not enough that the contract may operate to his bene-
fit, but it must appear that the parties intended to recognize him as the
primary party in interest and as privy to the promise.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 798–807; Dec.
Dig. § 187.*]

11. CORPORATIONS (§ 565*)—MORTGAGE—EFFECT OF ASSUMPTION BY LESSEE.

An agreement in a lease of a street railroad, by which the lessee as-
sumed and agreed to pay mortgage bonds to be issued by the lessor, im-
poses on it no higher obligation than to save the lessor harmless from
the consequences of a foreclosure by paying any deficiency which may
exist after the sale of the mortgaged property, which remains the pri-
mary fund for payment of the debt; and conceding the right of the bond-
holders to enforce it, as made for their benefit, they have no claim which
can be proved against receivers of the lessee prior to such foreclosure
and sale.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282;
Dec. Dig. § 565.*]

12. GUARANTY (§ 1*)—FAILURE OF CONSIDERATION—NECESSITY OF PRINCIPAL
OBLIGATION.

A guaranty is a collateral undertaking, and cannot exist without a
principal liability; default of a principal being essential to liability of
the guarantor.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 1; Dec. Dig.
§ 1.*]

13. CORPORATIONS (§ 565*)—INSOLVENCY AND RECEIVERS—CLAIMS PROVABLE
AGAINST RECEIVERS.

Pursuant to an assumption clause in a lease of a street railroad, the
lessee made an indorsement on mortgage bonds issued by the lessor, by
which it guaranteed to the trustees of the mortgage for the benefit of
the bondholders the punctual payment of principal and interest of the
bonds in accordance with their tenor. The lessee became insolvent, and
the bondholders filed a claim against its receivers for the principal and
interest of the bonds. *Held*, that the agreement was one of guaranty,
and, there having been no foreclosure of the mortgage, that the claim
for the principal and future interest was wholly uncertain and not prov-
able, but that the claim for interest past due at the time it was filed was

certain and in the nature of rent, and was provable and might be proved by the bondholders, since, while the promise was in form to the mortgage trustee, it was expressly for their benefit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*]

**14.** CORPORATIONS (§ 565*)—INSOLVENCY AND RECEIVERS—CLAIMS PROVABLE AGAINST RECEIVERS.

Where receivers of an insolvent lessee street railroad company operate the leased road for an experimental period without paying the stipulated rental, and then renounce the lease, the lessor's demand for the unpaid rental during such period constitutes a general claim, provable against the lessee's estate.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*]

**15.** CORPORATIONS (§ 565*)—INSOLVENCY AND RECEIVERS—CLAIMS PROVABLE AGAINST RECEIVERS—CERTAINTY.

Where receivers of an insolvent lessee street railroad company are operating the leased road experimentally, to determine whether or not they will adopt the lease, but without paying the stipulated rental, and they subsequently renounce the lease, the court should extend the time within which the lessor may file a claim for such rental until after the experimental period has terminated and its claim has become certain.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*]

**16.** CORPORATIONS (§ 565*)—INSOLVENCY AND RECEIVERS—CLAIMS PROVABLE—COVENANTS IN LEASE.

Under a covenant in a lease of a street railroad binding the lessee to pay franchise taxes assessed against the lessor, but permitting it to contest their validity in the courts, the estate of the lessee in insolvency is liable to the lessor for the amount of such unpaid taxes which became due and payable prior to the time limited for filing claims against its receiver, although they were then in litigation and their validity had not been determined; but claims for such taxes to become due in the future are not provable, because of uncertainty.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*]

**17.** CORPORATIONS (§ 565*)—INSOLVENCY AND RECEIVERS—CLAIMS PROVABLE AGAINST RECEIVERS.

Provisions in a lease of street railroad property (1) that the lessee should pay rental equal to 7 per cent. annually on the capital stock of the lessor, (2) that the intention was that all of such rental should be applied to the payment of dividends on such stock, (3) giving the lessee the option of paying it directly to the stockholders, and (4) containing a guaranty by the lessee to "every present or future holder" of such stock that dividends at the rate of 7 per cent. should be paid thereon "during the term of this lease," but providing (5) that payment to the lessor company should be deemed a compliance with such guaranty, constituted a contract for the benefit of the stockholders, on which they could maintain a direct action against the lessee. But whether the liability of the lessee to the stockholders be considered as based on an original engagement to pay rentals to them, or on the guaranty as a collateral undertaking, their claims are provable against its receiver in insolvency as to unpaid rentals which became due prior to the date fixed by the court for filing claims against the receiver, and also prior to the termination of the lease, but claims for rentals accruing thereafter are too uncertain for allowance.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**18. STREET RAILROADS (§ 49*)—LEASE — CONSTRUCTION — "TERM OF THIS LEASE."**

A guaranty in a lease of a street railroad of the payment of dividends to stockholders of the lessor during the "term of this lease" is to be construed as meaning during the existence of the lease, and not during the term for which it was made.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*

For other definitions, see Words and Phrases, vol. 8, pp. 6916, 6917.]

**19. STREET RAILROADS (§ 58*)—INSOLVENCY AND RECEIVERS—CLAIMS PROVABLE AGAINST RECEIVER.**

A settlement of mutual accounts between lessor and lessee street railroad companies, and an acknowledgment by the lessor that it had no indebtedness for which the lessee was responsible, *held* to refer to large accounts between them only, and not to current charges, and not to estop the receivers of the lessor to assert claims for taxes assumed by the lessee in the nature of rentals against the receiver of the lessee.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 135; Dec. Dig. § 58.*]

Appeals from the District and Circuit Courts of the United States for the Southern District of New York in the New York City Railway Company and Metropolitan Street Railway Company Receivership Causes.

Suit in equity by the Pennsylvania Steel Company and another against the New York City Railway Company and others. From decrees of the Circuit and District Courts (188 Fed. 339, 343; 189 Fed. 661; 190 Fed. 609; 194 Fed. 543), the Pennsylvania Steel Company and others, the Metropolitan Express Company, the National Conduit & Cable Company, Alexander J. Hemphill and others, as a committee, the Central Crosstown Railroad Company, John J. Waterbury and others, as a committee, and Charles Benner and others, as a committee, separately appeal. Certain decrees affirmed, others modified, and others reversed.

**I.** Appeal Presenting the Question Whether the Losses Incurred in Operating the Leased Railway System During the First Part of the Receiverships Should be Borne by the Estate of the Lessor Corporation or That of the Lessee Corporation: Called the "Termination of Lease Proceeding."[1]

For opinion below, see 190 Fed. 609.

The New York City Railway Company is a street railway corporation under the laws of the State of New York which was organized

---

[1] It is a misnomer to designate this appeal as the "Termination of Lease Proceeding." While one of the questions referred to the special master was as to the termination of the lease, the real controversy is whether the Metropolitan estate or the City estate should bear certain burdens of the receivership. Whether or at what time the Metropolitan-City lease terminated as between the parties has no bearing upon that question and the lease could not have been terminated as to the receivers because it never became binding upon them.

If the ruling of the special master with respect to the termination of the lease be intended as a conclusion that the lease never affected the trust

---

in 1901 under the name of Interurban Street Railway Company and which will hereinafter be referred to as the City Company. In 1902 this corporation had acquired the property and franchises of a small street railway in Mt. Vernon, New York, of slight value.

The Metropolitan Street Railway Company, which will hereinafter be called the Metropolitan Company, is a street railway under the laws of the State of New York, which was formed in 1895 by the consolidation of various companies and which by the year 1902 had acquired and was operating nearly the entire street railway system in the county of New York. At this time the Metropolitan Company owned and controlled most valuable railway franchises. It held many properties by leases and similar arrangements and had guaranteed interest upon underlying securities.

On February 14, 1902, the Metropolitan Company leased to the City Company its entire railway system for the period of 999 years for the consideration of the assumption of all its obligations except the principal of its funded debt and for the further consideration of the agreement of the City Company to pay an annual rental equal to 7 per cent. upon its capital stock.

The City Company took possession of the Metropolitan Company system under the lease and operated it with continually increasing deficits until September 24, 1907, when receivers of its property were appointed in a suit brought in the court below by its creditors alleging its insolvency.

On October 1, 1907, the Metropolitan Company, averring that it was of vital importance to it and its creditors that its property should be kept intact, petitioned to become a party to the creditors' suit and the persons who had been appointed receivers of the City Company were appointed also receivers of the Metropolitan Company. Afterwards the same men were appointed receivers in foreclosure proceedings instituted in behalf of Metropolitan bondholders.

Neither the Metropolitan Company nor the trustees for the bondholders asked for the appointment of separate receivers for the Metropolitan interests until June, 1908. Thereupon in July, 1908, a separate receiver was appointed for the City Company and an order was entered directing the surrender of the properties to the Metropolitan receivers.

On August 1, 1908, the lease aforesaid was formally surrendered to the Metropolitan receivers. It had, however, been practically laid out of consideration after the receivers had been in office but a short

estate, it adds nothing to other rulings. And if it be intended as a conclusion that the lease came to an end at the time stated as to all parties, it relates to a question outside any substantial controversy presented upon this appeal and, moreover, the facts found do not support it. As pointed out in other appeals, this question of the termination of the lease involves an inquiry as to the right and fact of re-entry and should be passed upon only when necessary to a real controversy and upon a complete statement of facts.

But as the name "Termination of Lease Proceeding" is used in the records and briefs, it will, although inappropriate, be retained throughout this series of appeals.

time. The facts then appearing made it obvious that the lease could not be adopted with profit to the City estate.

The Metropolitan system was to some extent disintegrated in January, 1908, when the Third Avenue Railroad, comprising a substantial part of it, was transferred to a separate receiver appointed in a foreclosure suit brought in behalf of Third Avenue bondholders. Other roads were also surrendered to their owners.

No order appears to have been made defining the duties of the receivers in their dual capacity as receivers of the City Company and of the Metropolitan Company. The reason for this is stated in the opinion of the Circuit Judge to have been a desire to have the receivers concerned solely with the operation of the railroads and their restoration to a state of efficiency and to reserve for later consideration the question as to which estate should bear the burden of any losses incurred through the operation.

The reports and accounts of the receivers showing the operation of the roads from September 24, 1907, to July 31, 1908, were, as a general rule, made out by them as receivers of the City Company. The facts would also justify the finding that, with respect to third persons, the roads were actually operated by the City Company receivers during such period.

The operation of the railroads by the receivers during the period aforesaid resulted in large losses. According to a statement filed by them the losses from operation amounted to $1,202,137.05 and in addition large expenditures were made for betterments and improvements. The losses from operation, however, did not arise through the mere running of the road. If the receivers had done nothing more than to move the cars there would have been a surplus instead of a deficit. The loss arose through the payment of interest upon underlying securities and rentals upon leased lines of the Metropolitan Company—payments necessary to keep its system together.

The receivers of the City Company upon their appointment took over quick assets belonging to that corporation of large value which were available for the payment of its debts. If the deficits stated in the last paragraph be charged against the City estate, substantially all of such assets will be used up.

The present appeal involves, broadly speaking, the question whether operating deficits and expenditures for betterments should be borne by the Metropolitan estate or by the City estate. The Circuit Court referred certain questions to a special master who held, in substance, that expenditures for the entire period should be charged against the Metropolitan estate. The Circuit Court modified the report of the special master by holding that the losses from September 24, 1907, to October 1, 1907—the period prior to the appointment of the Metropolitan receivers—should be charged against the assets of the City Company but approved the report of the Master with respect to the remaining period.[2]

Other material facts are stated in the opinion.

[2] Strictly speaking the questions presented by this appeal are somewhat narrower than is indicated by the above statement.

Bronson Winthrop and Charles T. Payne, for Farmers' Loan & Trust Co.
James Byrne and C. M. Travis, for Pennsylvania Steel Co.
Morgan J. O'Brien, C. E. Rushmore, and George N. Hamlin, for contract creditors' committee.
Matthew C. Fleming, for receiver of New York City Ry. Co.
B. S. Catchings, for tort creditors' committee.
Julien T. Davies and Brainard Tolles, for Guaranty Trust Co.
Richard Reid Rogers, for New York Rys. Co.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). [1] A chancery receiver is an indifferent person appointed by the court to hold property in litigation pending suit. He is a ministerial officer with the function of a custodian. He derives his authority from the court and not from the parties at whose instance he is appointed. He acts in behalf of no particular interest, but guards the rights of all. Being a mere holder, his appointment does not change the title to the property in his charge, nor alter any lien of contract. Booth v. Clark, 17 How. 322, 15 L. Ed. 164; Quincy, etc., R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632; Union Bank v. Kansas City Bank, 136 U. S. 223, 10 Sup. Ct. 1013, 34 L. Ed. 341; Gaither v. Stockbridge, 67 Md. 222, 9 Atl. 632, 10 Atl. 309. See, also, Atlantic Trust Co. v. Chapman, 208 U. S. 360, 28 Sup. Ct. 406, 52 L. Ed. 528, 13 Ann. Cas. 1155.

[2] When a court of chancery appoints a receiver of the property of a railroad company which embraces a leasehold estate, it is his duty to take possession of it, but he does not by such act become assignee of the term. He does not stand in the shoes of the lessee and is under no obligation to adopt its contracts. As said by the Supreme Court of Maryland (Gaither v. Stockbridge, supra) in language approved by the Supreme Court of the United States (Quincy, etc., R. Co. v. Humphreys, supra):

"The ordinary chancery receiver, such as we have in this case, is clothed with no estate in the property, but is a mere custodian of it for the court; and, by special authority, may become an officer of the court to effect a sale of the property, if that be deemed necessary for the benefit of the parties concerned. If the order of the court, under which the receiver acts, embraces the leasehold estate, it becomes his duty, of course, to take possession of it. But he does not, by taking such possession, become assignee of the

---

The special master reported that expenditures made and incurred by the receivers during the period from Spetember 24, 1907, to August 1, 1908, of which the expenditures for conductors' wages were types of operating expenses and the expenditures for scraper cars and feeders were types of betterments and improvements, should be charged against the Metropolitan estate.

The court in its decree modified the report of the special master with respect to the period for which the Metropolitan estate was charged, but still confined itself to the types of expenditures aforesaid and provided that the decree should not prevent any party from claiming nor the court from deciding that other types of expenditure should be charged against the Metropolitan estate. Therefore we shall, in the relief to be granted, confine ourselves to the particular subject-matter of the decree appealed from. But other expenses, e. g., expenditures for preserving the integrity of the system by preventing forfeitures and foreclosures, are allied to operating expenses and as the records are complete and the briefs very full, we deem it desirable for all concerned that the case shall be discussed in the following opinion along somewhat broad lines.

term, in any proper sense of the word. He holds that, as he would hold any other personal property involved, for and as the hand of the court, and not as assignee of the term."

See, also, High on Receivers, page 321, and cases cited.

[3] If a receiver elect to adopt a lease, he becomes vested with the title to the leasehold interest and a privity of estate is thereby created between the lessor and him by which he becomes liable upon the covenant to pay rent. United States Trust Co. v. Wabash R. Co., 150 U. S. 299, 14 Sup. Ct. 86, 37 L. Ed. 1085, and cases cited. But unless and until he does adopt a lease, there is no such privity and no liability upon the lease. He holds possession not as a trespasser but rather as a licensee for the purpose of determining what disposition to make of the leasehold estate. The rule is well settled that a receiver in taking possession of a leased road is entitled to a reasonable time in which to decide whether the interests of his trust will be better subserved by making the lease his own or by returning the property to the lessor. Quincy, etc., R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632; St. Joseph, etc., R. Co. v. Humphreys, 145 U. S. 113, 12 Sup. Ct. 795, 36 L. Ed. 640; U. S. Trust Co. v. Wabash R. Co., 150 U. S. 287, 14 Sup. Ct. 86. 37 L. Ed. 1085; New York, etc., R. Co. v. New York, etc., R. Co. (C. C.) 58 Fed. 278; Park v. New York, etc., R. Co. (C. C.) 57 Fed. 799; High on Receivers, page 321; Smith on Receiverships, page 105.

This rule grows out of the necessities of the case and is not inequitable toward the lessor. The contract of lease is not necessarily affected by the appointment of the receiver. The right of the lessor to enter for condition broken is not impaired. It may stand upon its legal rights. But ordinarily it is not in a position to stand upon them. A lessor railroad company is seldom so situated that it can take back its property immediately upon the appointment of a receiver for its lessee. It may have no working organization. Its rolling stock may have become worn out. It may have insufficient immediate funds. Its public duties, however, must be performed without interruption. It is a quasi public corporation and must keep its railroad going. Its franchises must be preserved. Its obligations as a common carrier must be fulfilled. And these obligations can seldom be fulfilled except by the temporary operation of the leased road by the receiver of the lessee. A court of equity in provisionally operating a leased line confers a benefit upon the lessor company as well as upon the lessee which renders it highly equitable that the receiver by such operation should not be held to adopt the lease but should have a breathing spell within which to determine whether to accept or reject it.

These equitable considerations are indicated in the opinion of the Supreme Court in the leading case of Quincy, etc., R. Co. v. Humphreys, 145 U. S. 82, 101, 12 Sup. Ct. 787, 793 (36 L. Ed. 632), already referred to, where Mr. Chief Justice Fuller said:

"The court did not bind itself or its receivers eo instanti by the mere act of taking possession. Reasonable time had necessarily to be taken to ascertain the situation of affairs. The Quincy Company as a quasi public corpora-

tion, operating a public highway, was under a public duty to keep up and maintain its railroad as a going concern, as was the Wabash Company under the contract between them, but the latter had become unable to perform the public service for which it had been endowed with its faculties and franchises, and which it had assumed to discharge as between it and the other company. Its operation could only be continued under the receivers, whose action in that respect cannot be adjudged to have been dictated by the idea of keeping the property in order to sell it, or using it to the advantage of the creditors, or doing otherwise than 'abstain from trying to get rid of the property.'"

[4] The further rule is also settled by the great weight of authority in the case of railroad leases that a receiver of a lessee corporation by provisionally operating a leased road does not thereby become bound to pay rent for the trial period at the rate stipulated in the lease in case he elect to renounce it. In the absence of special equities he does his full duty when he turns over to the lessor the entire net earnings of the road.[3] U. S. Trust Co. v. Wabash R. Co., 150 U. S. 287, 14 Sup. Ct. 86, 37 L. Ed. 1085; Mercantile Trust Co. v. Farmers' Loan, etc., Co., 81 Fed. 254, 26 C. C. A. 383; Park v. N. Y., etc., R. Co. (C. C.) 57 Fed. 799; N. Y., etc., R. Co., 58 Fed. 268; Central Trust Co. v. Wabash, etc., R. Co. (C. C.) 34 Fed. 259; Farrar v. Southwestern R. Co., 116 Ga. 337, 42 S. E. 527.

While the reason for the rule that the receiver is bound to account only for net earnings is not always stated in the authorities, it is clear that it must be based upon the lessor's acquiescence. As we have seen, the lease in no way governs the relations between the receiver and the lessor. The receiver for the time being is operating the property of almost a stranger corporation for, to a large extent, its benefit. The corporation is willing that he should so act. If, then, he turn over the entire net earnings of the road, it is not apparent upon what equitable principles the acquiescing lessor can demand more. If the lessor do not acquiesce—if it knock at the door of the court and demand back its property—it is in a position to demand the stipulated rental. Farmers' Loan, etc., Co. v. Northern Pacific R. Co. (C. C.) 58 Fed. 257. But if it do nothing, it is not unfair that it should take what its property earns and no more.

But this does not cover the contingency where there are no net earnings and the leased road is operated by the receiver at an actual loss. There is a difference between giving a lessor corporation that which its road earns and making it pay a deficiency. And yet we think that the difference is not one of principle. If a lessor assent to the performance of its public duties by the receiver of

---

[3] Exceptions to the rule that a receiver is obliged to account only for earnings are established in cases when the leased property is in itself non-producing and yet is a benefit to the system as a whole, e. g., a depot or terminal, and would undoubtedly be established in a case where a leased road is not wholly non-producing but the net earnings furnish no fair criterion of its value to the system, e. g., a feeder or connecting line. In such cases the special equities would require a receiver to pay a reasonable rental. In the present case, however, it is not necessary to consider this phase of the subject.

the lessee, it should take the results as they come. Its franchises are the ones which are preserved by the continued operation. It is essential to it that operations should go on. The same principles which give the acquiescing lessor net earnings instead of rentals make it liable for deficiencies when there are no net earnings. In other words, we think that the receiver must be considered as operating the leased road for the account of the lessor.

It is not necessary in order to hold a lessor corporation which acquiesces in the operation of its road by the receiver of the lessee responsible for losses in operation that it should expressly promise to pay for them. The law would imply a promise in such circumstances. A lessor corporation may demand the return of its property. It is free to take the benefit of, or reject, a receiver's services. If it accept them, there is an implied promise to meet the necessary consequences of them.[4]

The conclusion which we have reached has, we think, the support of authority. In Mercantile Trust Co. v. Farmers' Loan & Trust Co., 81 Fed. 254, 258, 26 C. C. A. 383, 387, the Circuit Court of Appeals for the Eighth Circuit said:

"If the lease should have been renounced, no part of the deficiencies resulting from the operation of the leased lines can be charged against or paid out of the income or out of the proceeds of the corpus of the trust estate, but these deficiencies must all be paid by the railroads which respectively caused them."

As in that case the leases referred to were not renounced, the proposition of law stated was not necessary to the decision, but it was one of the reasons for it and we are satisfied that the term "deficiencies" was used advisedly and as meaning loss in operation and not mere failure to earn the stipulated rental.[5]

[4] While we have examined the underlying principles, and shall test them in the application, upon the theory that there was but one receivership—that of the lessee—it must be observed that the real question is not whether a promise would be implied which would support an action at law. In this case the receivership was extended to the lessor's estate and the court had full power to impose the burdens of the receivership as equity might require and was not confined to strictly legal obligations.

[5] Ames v. Union Pacific R. Co. (C. C.) 74 Fed. 335, is also to be regarded as authority for the general proposition that where receivers of a railroad system operate a subsidiary road as a part of it (although they may also be receivers of such subsidiary) and keep a general account, profits accruing in the operation of the subsidiary belong to it and losses sustained must be charged against its estate. In that case Judge Sanborn said: "If, as receivers of the property of the Gunnison Company, these receivers had realized a large net income from the property of its railroads, could they have lawfully diverted that income from its creditors or stockholders to the creditors and stockholders of the Union Pacific Company? Could they have lawfully used that income to pay a loss occasioned by the operation of a railroad of the Union Pacific Company or by the operation of the railroad of any other corporation than the Gunnison Company? These questions are their own answers and they are fatal to the claim of this trustee that the deficiency incurred by the operation of the railroads of the Gunnison Company, or the taxes upon its property, or the purchase price of the materials and supplies furnished to the succeeding receiver, may be lawfully paid out of the trust funds of the creditors of the Union Pacific

[5] Holding, then, that the general rule established by equitable considerations is that a leased railroad is operated by the receiver of the lessee during the trial period for the account of the lessor or, from the standpoint of results, that the lessor takes net earnings and must bear losses, we come to the inquiry whether any special equities prevent the application of the rule in the present case.

It is obvious at the outset that this is not the ordinary case of a railroad lease under a receivership. The lease of the vast Metropolitan system with its valuable franchises and its own underlying leaseholdings and obligations to the owner of the little Mount Vernon road differs widely from the usual case of the lease of a connecting road to a main line. But there are no special equities in favor of the lessor corporation on that account. Rather the differences serve to accentuate the fact that the franchises to be preserved belonged to the lessor and that the imperative necessity for continued operation after the receivership was to hold its property together.

Going further, let us consider the case as if the Metropolitan Company had merely intervened in the cause and had not obtained the appointment of receivers for its own properties until August, 1908. Let us assume also that the receivers of the City Company were operating the road until that time for the purpose of determining whether to accept or renounce the lease. The special master has found that the time was reasonable and no objection is made to his conclusion.

In this view of the case, every equitable consideration which we have examined in formulating the rule is present. The franchises to be preserved belonged to the lessor corporation. The payments were necessary to preserve them as well as the integrity of its system. The City receivers might have held on to their quick assets and have failed to operate without damage to their trust estate. But they could not have failed to operate without imperiling the franchises and properties of the lessor. The lessor, by intervening in the suit to keep its properties intact, assented to their operation and to their performance of its public duty. If there were nothing more in the case than this, we should have no doubt that the receivers operated for the account of the lessor and that its estate should be charged with the deficits in operation.

Company. These expenditures must be charged against the property of the Gunnison Company—against the property, the administration and operation of which caused them." See, also, Union Trust Co. v. Illinois Midland R. Co., 117 U. S. 434, 6 Sup. Ct. 709, 29 L. Ed. 963.

In this connection it should be said that we are aware of the cases (U. S. Trust Co. v. Wabash R. Co., 150 U. S. 287, 14 Sup. Ct. 86, 37 L. Ed. 1085; Central Trust Co. v. Wabash R. Co. [C. C.] 34 Fed. 259; also Quincy, etc., R. Co. v. Humphreys, 145 U. S. 92, 12 Sup. Ct. 787, 36 L. Ed. 632) in which it is stated to be the duty of a receiver to reduce operating expenses to a minimum where a deficiency results from the operation of a leased road, but we do not regard those cases as passing upon the question whether, in the final accountings, such deficiencies should be borne by the estate of the lessee or that of the lessor.

But there is much more in the case. In the first place we are not required to hold that the Metropolitan estate is liable for actual deficits incurred by the receivers in the operation of the road. As shown in the preliminary statement, there were no deficits from the running of the cars. The deficits arose from the payments of rentals upon Metropolitan leaseholds and interest upon Metropolitan underlying securities—payments necessary to preserve the integrity of the Metropolitan system but not necessary to operate the roads. The City receivers were not required to make these payments because the lease was not binding upon them. Making them for the distinct benefit of the Metropolitan Company by direction of a court of equity in a cause to which the Metropolitan was a party, there would seem little doubt that the court should and would charge them against its estate. And this is even more true with respect to disbursements for betterments and improvements.

Again while we think that the losses during the period in question should properly be charged against the Metropolitan Company even if the receivership had not been extended to it, the fact is, as we have seen, that the City receivers were appointed also receivers of the Metropolitan after one week's operation of the roads. Undoubtedly for this first week the City receivers should be considered as holding for the purpose of determining whether to accept the lease, and the losses for such period should be charged against the Metropolitan estate upon the principles which we have examined. But, as already stated, we are satisfied that after a very short time it was manifest to all concerned that the lease could not be adopted in behalf of the City estate and that the court would have transferred the properties to the Metropolitan receivers exclusively if application had been made. But no such application was made until June, 1908. Prior to that it is evident that the court intended that the dual receivers—regardless of the method of actual operations—"should manage the property merely as operating conservators," leaving all questions as to which trust estate should bear the burden to be determined thereafter. In such circumstances it is equitable that the order putting the Metropolitan receivers in complete charge should be carried back as the equities may require. And the equities clearly require that it should be so carried back that the burden of operation be borne by the Metropolitan estate. The adoption of the lease was out of the question soon after the receivers of the Metropolitan were appointed. The City estate had nothing whatever to gain by continuing operations except some possible tactical advantage based upon possession. The Metropolitan Company had all to gain by continuing operations and all to lose by stopping operations. The expenditures during the dual receivership were for the preservation and improvement of the Metropolitan property and every equitable consideration requires that they should be borne by the Metropolitan and not by the City interests.

The contention presented upon the briefs for the trustees of the Metropolitan bondholders that the Metropolitan estate should not be charged with the losses in question because to do so would displace their mortgage liens, does not require extended consideration. This court has to do only with the decree appealed from, and we find nothing in that decree providing for such displacement. If, however, the conclusions of the special master upon the subject are to be regarded as before us, we may say that we are not convinced that they are incorrect. The disbursements were, as we have seen, necessary to preserve the mortgaged property and to keep the mortgaged railroads in efficient running order so that they could fulfill their obligations to the public and retain their franchises. The mortgage trustees, although obtaining the appointment of their own receivers, did not seek to put them in possession, and we are not satisfied that if they had been the operating receivers from the beginning the expenditures would have been less. Under the circumstances we think that the case comes well within the principle of the decision of the Supreme Court of the United States in Kneeland v. American. Loan, etc., Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, where Mr. Justice Brewer says:

"A court which appoints a receiver acquires, by virtue of that appointment, certain rights and assumes certain obligations, and the expenses which the court creates in discharge of those obligations are burdens necessarily on the property taken possession of, and this, irrespective of the question who may be the ultimate owner, or who may have the preferred lien, or who may invoke the receivership. So if, at the instance of any party rightfully entitled thereto, a court should appoint a receiver of property, the same being railroad property, and therefore under an obligation to the public of continued operation, in the administration of such receivership, might rightfully contract debts necessary for the operation of the road, either for labor, supplies or rentals, and make such expenses a prior lien on the property itself."

See, also, Kneeland v. Bass Foundry, etc., Works, 140 U. S. 592, 11 Sup. Ct. 857, 35 L. Ed. 543. Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, is not regarded as in conflict with the principle stated.

We may add, however, that we do not determine whether the losses in question can be charged against the Metropolitan estate so as to displace the mortgage liens if there are sufficient general assets in such estate to meet them.

For these reasons we hold that the decree appealed from should be modified so as to conform to the report of the special master (190 Fed. 609) and as so modified should be affirmed. And it is so ordered.[6]

[6] The decree should also be modified in another particular. As pointed out at the commencement of this opinion, the question of the termination of the lease is not material in this proceeding and the paragraph of the decree marked (a) should be stricken out.

II. Appeal Presenting the Question Whether a Certain Claim of the Metropolitan Express Company for Damages for Breach of Contract is Provable Against the Estate of the Metropolitan and City Companies, and Involving a General Inquiry into the Rules Governing the Provability of Claims in Equity Receivership Causes:  Called the "Express Company's Appeal."

For opinion below, see 188 Fed. 339.

On March 4, 1901, the Metropolitan Railway Company entered into a written contract with the Metropolitan Express Company, by which it granted to the latter the exclusive right of moving express matter over its street railway system for a period of twenty years, agreeing among other things, to furnish the cars necessary therefor, and in which the Express Company agreed to pay to the Railway Company, as consideration, twenty per cent. of the gross earnings of the business. The contract provided that it should "bind the successors, assigns, lessees and transferees of the parties respectively."

Afterwards, on February 14, 1902, as shown in the statement in the Termination of Lease Proceeding the Metropolitan Railway Company leased and demised all its property, including said contract, to the City Railway Company, which assumed the obligations of the former upon said contract as appears by the following assumption clause in the lease:

"The lessee shall also from time to time pay or cause to be paid all rentals and other sums of money which are or may be or become due or payable under or by reason of any leases and other contracts to which the lessor is a party or to which any of the demised is, or may be subject, and the lessee hereby assumes all the obligations of the lessor under all such leases and contracts * * * provided that the lessee shall not be required to pay the principal of any funded obligations of the lessor or of its subsidiary companies except as hereinafter provided."

On July 15, 1904, the Metropolitan Express Company assigned said contract for its unexpired term to the American Express Company for the stipulated payment of $10,000 a year and the latter agreed to perform during such term all the obligations of the former under said contract.[7]

The provisions of said contract were duly carried out by the City Company—the lessee—and the American Express Company—the assignee—until September 24, 1907, when receivers of the City Company—and shortly afterwards of the Metropolitan Railway Company —were appointed as stated in the Termination of Lease Proceeding. Thereafter and until February 28, 1908, the receivers continued to fulfill said contract.  On that day they notified the American Express Company that they would not adopt the contract, and on March 15, 1908, they discontinued the operation of the express cars.

---

[7] While the agreement between the Metropolitan Express Company and the American Express Company covered other contracts than the one in question we assume from the presentation of the case on both sides that that was the only one of substantial value at the commencement of the receivership and, therefore, make the statement in the text.  If it is incorrect, a complication may arise which will have to be dealt with in the hearing in damages which we order.

The Metropolitan Express Company when operating under its own management made no profits upon said contract, but the American Express Company from the time of the assignment until its exclusion by the receivers made average net profits of over $29,000 a year. No question is made but that the American Express Company was of abundant financial responsibility to carry out its agreement with the Metropolitan Express Company to the end of the term thereof.

At the time of the appointment of the receivers of the City Company and also of the appointment of the receivers of the Metropolitan Railway Company both of those corporations admitted their insolvency and prayed for the appointment of the receivers.[8]

The special master, to whom was referred the claim of the Metropolitan Express Company against the estates of the Metropolitan and City Railway Companies for damages for breach of said contract, rejected it as a contingent demand. The court below confirmed the report of the special master and also held that the proof of damages was insufficient.

The Metropolitan Express Company has appealed to this court.

Other material facts are stated in the opinion.

Wm. H. Page and G. H. Crawford, for appellant.

A. H. Masten, William M. Chadbourne, and Albert F. Jaeckel, for Joline et al., receivers.

M. C. Fleming, for Ladd, receiver.

B. S. Catchings, for tort creditors' committee.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). [6] The objection that the claim is contingent and therefore not such a claim as is provable against the estate of a corporation in the hands of a court of equity, presents the underlying question in this series of appeals and requires a more complete examination and statement of principles than would be necessary in the consideration of a single cause.

The power of the Court of Chancery of England to appoint receivers was recognized at an early date and the leading principles which first governed its exercise were well settled long before the American Revolution. Vice Chancellor Giffard said of it in Hopkins v. Worcester, etc., Canal Co., 6 Eq. 437, 447: "That is one of the oldest remedies in this court." But according to the early principles as stated in England and followed in this country, the power was purely an incidental one and the exigencies which required its exercise were "to prevent fraud, to save the subject of litigation from material injury or to preserve or rescue it from inevitable destruction." Williamson v. Wilson, 1 Bland. Ch. 418.

From the early principles the law of receiverships has in recent years rapidly developed and with constantly widening scope. Indeed in no

[8] The City Company expressly admitted its insolvency and the Metropolitan Company averred that it was unable to meet its obligations. Both corporations prayed for the appointment of receivers and the special master has found that they were then insolvent. The precise facts are stated in the Crosstown Company's Appeal.

other branch of equity jurisprudence has there been such an adaptation of equitable principles to the requirements of commercial advancement. This development has taken place through the action of the chancery courts themselves, and, perhaps to a greater extent, through the extension by statutory enactments of the remedial action to subjects not within the original equitable scope. Especially has this been true in respect of the winding up of corporations and the administration of their assets. Statutes in many states and acts of Parliament in England provide for liquidating the affairs of corporations through receivers and define their powers, duties and liabilities. These statutes generally provide for the presentation and allowance of the claims of creditors and, in some cases, define who are creditors.

Apart from statutes, moreover, the law of receiverships has gone through a curious course of development with respect to corporations. The rule has been uniformly stated in the books and is still insisted upon that, in the absence of statutory authority, a court of equity has no power to appoint a receiver even of an insolvent corporation. It is said that such a court has no inherent power to wind up a corporation and that it cannot accomplish by indirection that which it cannot do directly. And, it is perfectly true that the administration of the affairs of a corporation by a receiver and the distribution of its assets while not destroying its corporate existence do leave it a mere shell. Nevertheless exceptions to the rule have been evolved which are, in some aspects, as broad as the rule itself.

One of these exceptions is in the case of creditors' bills. Courts of equity long ago lent their assistance to common law courts to enable particular judgment creditors to reach, through receivers, property beyond the reach of execution. These suits soon broadened in scope and were treated as equitable levies in favor of all judgment creditors entitled to seize the defendant's property—a substitute for separate proceedings. In these suits no distinctions were drawn between corporations and individuals and out of them the practice has grown up and become established of permitting creditors having judgments to apply to courts of equity to take possession of the assets of corporations and undertake through receivers their general administration. And now that which was formerly regarded as the essential thing— the judgment—is unnecessary unless the corporation object. Thus is illustrated anew the vainness of saying what courts of equity *cannot* do.[9]

This evolution of the creditors' bill into the proceeding by which courts of equity undertake the general administration of the estates of corporations has not, however, brought with it any well defined principles with respect to the provability of claims of creditors. Lead-

[9] Whatever doubts may have existed as to the broad authority of courts of equity stated in the text must now be regarded as settled by the action of the Supreme Court in this very cause. Re Metropolitan Ry. Receivership, 208 U. S. 90, 28 Sup. Ct. 219, 52 L. Ed. 403. The practice of making such appointments has become particularly well established in the case of quasi public corporations where the interests of the public require continuous and continued operation and where, generally, the bankruptcy act is not available.

ing text-books upon the law of receiverships hardly mention the subject and the authorities are few and far between.[10]   It is altogether a mistake to assume that cases like the present can be determined by the application of hard and fast rules.   Such rules do not exist.   They have yet to be formulated.

Bankruptcy acts and state statutes regulating the provability of claims against insolvent or dissolved corporations are only entitled to consideration in so far as the rules they lay down appeal to the conscience of the chancellor.   So, the decisions of the courts construing and applying such acts and statutes are only of weight when they discuss principles of general application.

Equitable consideration must govern and the underlying ones are these:   The assets of an insolvent corporation belong to its creditors. Although not, strictly speaking, a trust fund, they partake of the nature of one.   The administration of the estate is for their benefit. Its purpose is to make an equitable distribution.   Equality is equity. Debts and liabilities, present and future, certain and contingent, stand upon the same *equitable* basis.   If delays were unimportant, the settlement of estates would be kept open until contingencies should become certainties.   If courts were omniscient, distribution would always be through the resolving of all contingencies and the ascertainment of the present worth of all demands.   But courts cannot look with certainty into the future.   Delays are important.   The settlement of estates cannot be held open to await contingencies.   Orderly administration requires that at some reasonably speedy time all claims should be so liquidated as to afford a basis for distribution.

A court of equity, then, in prescribing what claims shall take in the distribution of the estate of a corporation must regard, on the one hand, the substantial right of all creditors to share in their debtor's property, and, on the other, the necessity for expeditious administration and, giving due consideration to both, must make rules which are practicable as well as equitable.

In formulating rules we may, at the outset, stick to beaten paths and divide claims into these three classes:

(1) Claims which at the commencement of proceedings furnish a present cause of action;

(2) Claims which at that time are certain but which are not matured;

(3) Claims which are contingent.

Claims of the first class are obviously provable and require no discussion.   Claims of the second class are also clearly provable.   The right of a creditor to participate in the assets of an insolvent estate—

---

[10] The receivership causes which have made the great bulk of receivership law in this country and which, like judgment creditors' suits, constitute exceptions to the limitation of the power of chancery courts over corporations—mortgage foreclosure receiverships—seldom involve the question of the provability of general claims.   In such cases the receivers hold the mortgaged premises and the only questions with respect to claimants are whether their demands so take priority as to displace the mortgage lien.   The questions relate rather to charges upon the property than to the provability of claims.

a right in rem and not in personam—is not dependent upon the existence of an accrued cause of action at the time of the receivership. Every equitable consideration requires that the assets which belong to creditors should be shared in by those whose demands are not then due but which are fixed in amount and certain to become due at a stated time in the future. Bankruptcy and insolvency statutes permit the proof of claims of this class, and it is manifest that they should be proved in an equity cause.

The third class—contingent claims—requires more extended consideration. The bankruptcy act of 1841 expressly permitted the proof of contingent demands. The act of 1867 likewise permitted the proof of such demands and provided that if the contingency happened before the final dividend, the claimant should receive his share. It also provided for the ascertainment and liquidation of such demands. The English Bankruptcy Act permits the proving of "all debts and liabilities, present or future, certain or contingent" and provides for the ascertainment of "the value of any debt or liability provable as aforesaid, which by reason of its being subject to any contingency or contingencies or for any other reason, does not bear a certain value." The English winding-up statute also allows the proof of contingent claims and provides that a "just estimate" of their value shall be made. On the other hand the present bankruptcy statute in this country permits the proof of "fixed liabilities" but excludes contingent claims.

If we should attempt to formulate equitable rules from these statutes we should probably follow none of them. The early acts and the English statutes indicate a procedure of uncertainties inconsistent with the expeditious settlement of estates. On the other hand the present bankruptcy law, which deals with individuals as well as corporations and has regard to the right of discharge, can hardly be regarded as a guide in a purely equitable matter affecting corporations alone. If we go on in this direction, we shall have to lay out a middle course between the statutes which will be both practicable and equitable.

But it is not worth while to strive for such a course and to attempt to define and distinguish between contingent demands. We shall only attain by a circuitous way an end which we can reach by going directly to it. The real inquiry in getting at a basis for the distribution of an insolvent estate is whether the claims are reduced to dollars and cents. If they are so reduced or can be so reduced by the application of recognized principles they are entitled to share. If they are not they cannot share. And this not at all for any reason affecting their merits nor strictly speaking because they are contingent, but because they are uncertain. So, without laying stress upon the question whether claims are (1) past due, (2) immature, or (3) contingent, the real way we should divide them with respect to the question of provability is into these two classes:

(1) Claims of which the worth or amount can be determined by recognized methods of computation at a time consistent with the expeditious settlement of the estates;

(2) Claims which are so uncertain that their worth cannot be so ascertained.

The second class of claims cannot be proved. They may be highly meritorious, but they cannot share in the estate because their amounts cannot be ascertained.

The first class of claims ought to be proved and share in the estate and this whether they are overdue accounts, immature notes, or claims for damages for breach of contract co-inciding with or following the receivership. It is impossible to point to any equitable ground which would justify a court of equity in excluding the holders of any of such claims from sharing in the estate of their debtor.[11]

One more question remains for consideration in formulating any general equitable rule. A time should be stated with respect to which the status of claims should be fixed. The briefs upon these appeals indicate a general impression among counsel that the date of the appointment of the receivers is the time which controls. Apparently this view is based upon the earlier theory of the courts that a creditors' bill is an equitable levy equivalent to a general execution in favor of creditors who at the time it is filed are in a position to obtain execution or attachment. But, as we have seen, the right to share in corporate assets is, at the present time, not confined to creditors who might themselves have instituted separate proceedings, nor are the assets to be shared in those alone which could be seized upon execution. The present extension of equitable jurisdiction over corporations would be wholly unjustifiable if it were for the benefit of a particular class of creditors. Consequently the time of the appointment of the receiver constitutes no logical or necessary date for determining the provability of demands and it should be fixed as equity, with due regard to convenience, may require.

The commencement of the receivership should properly determine the existence of the corporate engagement. The estate should not be liable upon contracts or agreements entered into by the corporation after the appointment of the receiver. But when the engagement exists, we perceive no equitable reason why that time should determine the provability of demands based upon it. Indeed the equitable considerations are rather the other way. There are cases in which the very fact of the appointment of the receiver breaks the obligation and creates the demand. In such cases it is manifestly inequitable that any technical objection should operate to prevent the proof of the claim. So, in many cases, uncertainties regarding claims may be removed soon after the appointment of the receiver and before any-

---

[11] The language of the Chancellor in Späder v. Mural Decoration Mfg. Co., 47 N. J. Eq. 18, 20 Atl. 378, although in reference to proceedings under a winding-up statute, is equally applicable to an equitable cause:

"The receiver is bound in duty and clothed with power to reach out and take in every conceivable asset due or thereafter to accrue to the corporation. A complete collection of assets is contemplated and a full and final distribution of them is made possible. Such being the situation, natural justice demands that those who suffered from breaches of contract should be included in the distribution, even though the breaches and consequent damages follow the insolvency."

thing is done towards making up accounts or distributing assets. Claims of this nature should share in the estate. And the effort of a court of equity should be to have them share. It is not a light thing for a chancery court, acting without statutory direction, to say that a creditor shall lose his demand when he has not been at fault and when the settlement of the estate will not be protracted by allowing it. We find much to approve in the report of the special master (confirmed by the Circuit Court) in New York Security & Trust Co. v. Lombard Inv. Co., 73 Fed. 537: [12]

"No inconvenience or delay will accrue from the operation of the rule embraced in class No. 3 of claims recommended to be allowed, and which we are considering, viz.: That claims, though not matured, or which did not, at the time of the appointment of the receiver, constitute a direct obligation, but which have since matured, or will have matured, or constitute such obligation, before any order of distribution is made, should be allowed. If a series of dividends were to be declared, and the proofs and allowance of claims were to be kept open after the order of distribution, and until the close thereof, the case would be radically different, and such a rule could not be sustained, if for no other reason than that of ab inconvenienti."
\* \* \*
"But no inconvenience, delay, or embarrassment to the estate can arise from the application of the rule embraced in the classification referred to. This being the case, and as it is clear that a more perfect equity will be reached by refusing to make any arbitrary distinction between the rights of creditors whose claims matured yesterday or to-day, provided they are sufficiently matured before any order of distribution is made, it is my judgment that the classification made in that behalf is the proper one to be made."

Under the foregoing decision creditors were permitted to prove claims which, although not matured and certain at the time of the appointment of the receivers, became such before any order of distribution. We think this rule very nearly correct, although it probably goes too far in permitting the proof of claims up to the time of distribution. All claims ought to be in before the accounts are made up for distribution, and there should be no opportunity for uncertainty, delay or expense in reopening and recasting them. A narrower rule can be adopted which would obviate any difficulty in this regard and which would be simple, equitable and workable. It is this: Claims which when presented within the time limited by the court for their presentation are certain or are capable of being made

[12] This is almost the only case in which rules have been formulated with respect to the provability of claims against insolvent corporations. Although the Missouri statute is said to have governed, its language is so broad as not to materially affect the weight to be given to the decision in a general equity cause. In that case the special master reported the following classes of claims as those which should be allowed and his action was approved by the court:
"Class No. 1 embraces claims which, at the time of the appointment of the receivers, furnished a present cause of action against the guarantor (the corporation).
"Class No. 2 embraces all direct obligations of the company at the date of said appointment, whether due or to become due at some time in the future
"Class No. 3 embraces all claims, though not matured, or which did not, at the time of the appointment of the receivers, constitute a direct obligation, but which have since matured, or will have matured, or constitute such obligation, before any order of distribution is made."

certain by recognized methods of computation, should be allowed.[13] Claims which are not then certain should be disallowed because they afford no basis for making dividends. But there is no equitable reason why claims which are certain when presented and which are presented in time should have been certain at some arbitrary anterior period.

It is true that these conclusions are not entirely in accord with the decisions of some of the state courts in corporation dissolution proceedings, notably those of the New York Court of Appeals. People v. Metropolitan Surety Co., 98 N. E. 412, decided April 2, 1912; People v. Commercial Alliance Ins. Co., 154 N. Y. 95, 47 N. E. 968; People v. American Loan & Trust Co., 172 N. Y. 371, 65 N. E. 200. In these cases the rule seems to be established that the status of claims must be "fixed as of the date of the commencement of the action for dissolution" (People v. Metropolitan Ins. Co., supra), and the courts lay especial stress upon the principle that the judgment of dissolution "relates back to the commencement of the action." And it may well be that as the death of the corporation takes place by relation at the commencement of the dissolution proceedings that time should fix the status of claims in such proceedings without it following that a court of equity ought to select that time to govern purely equitable causes.

It should be observed, moreover, that our conclusions are not inconsistent with the rule that, in the case of an insolvent estate, interest is not allowed upon claims after the appointment of receivers. Thomas v. Western Car Co., 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663; Tredegar v. Seaboard Air Line R. Co., 183 Fed. 289, 105 C. C. A. 501; Solomons v. American Building, etc., Ass'n (C. C.) 116 Fed. 676; Bowman v. Wilson (C. C.) 12 Fed. 864. This rule is based upon the principle that any delay in the settlement of the estate for which interest might run is the act of the law and not of the insolvent debtor and it is applicable both to claims which are certain and to those which are uncertain so far as the latter may otherwise be entitled to interest. But a rule based upon the principle of not penalizing for the law's delay furnishes no reason for forfeiting the claim of a creditor which only becomes fixed in the course of such delay.

Having now considered the general principles governing the provability of claims in equity receivership causes, we come to the consideration of the particular questions arising in the present appeal. These are questions of law. The facts stand out for themselves. It is manifest that the Metropolitan Express Company met a serious loss. It transferred its interest in the Metropolitan Railway contract to a responsible corporation which assumed all its obligations and agreed to pay a substantial and certain income for a stated term.

---

[13] We fail to see that this rule is open to the objection that it is varying. If the last day fixed for the presentation of claims determine their status, there is no more variation than if the day of the filing of the bill or of the appointment of a receiver determine it. That the rule may not tie the hands of the court as much as some other rule is certainly no objection to it.

The Metropolitan Railway Company and its lessee, the City Company, became insolvent and their railroads went into the hands of receivers. The result was that the Express Company, without any fault on its part or on the part of its assignee, lost the benefit of this contract. The question whether it can prove a substantial claim for this loss depends, (1) upon whether the contract was broken at such a time as to permit the proof of the demand as a certain claim within the principles which we have examined, and (2) upon the sufficiency of the proof of damages.

Obviously at *some* time there was a complete breach of the contract. The contract gave the Express Company the right to move express matter over the Metropolitan roads and it was wholly excluded from the exercise of such right. When did the breach take place?

[7] The rule is well settled that where one party to an executory contract puts it out of his own power to perform it, there is an anticipatory breach which gives the other party an immediate right of action for the damages which he suffers thereby. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, contains a review of the American and English authorities, of which Hochster v. De la Tour, 2 E. & B. 678, is the leading case.

It is possible that the appointment of a receiver of an objecting corporation, although preventing it from carrying out its executory contracts, might be considered to be the act of the law and not such an act of the party as would constitute an anticipatory breach of such contracts within the rule. It is probable, too, that bankruptcy and insolvency do not break contracts when they do not in fact prevent performance. Thus the bankruptcy of a lessee does not terminate the lease and the lessee may be holden upon the rent covenant if he be permitted to continue his occupation. But when bankruptcy and insolvency do put it out of the power of the bankrupt or insolvent to perform his executory contracts, and when he does participate in bringing on the proceedings, they constitute the breach of such contract. How can it be otherwise? The situation is the equivalent either of an out and out repudiation or of a complete disablement and in either case the contract is broken.

In Re Pettingill (D. C.) 137 Fed. 143, Judge Lowell said:

"Bankruptcy itself may be treated as a breach of the bankrupt's contracts analogous to that complete repudiation of the contract before the time of performance which was shown in Hochster v. De la Tour, 2 E. & B. 678, and In re Roehm v. Horst, 178 U. S. 1 [20 Sup. Ct. 780, 44 L. Ed. 953], or to a complete disenablement of performance of the contract as in Frost v. Knight, 7 Exch. 111."

See, also, In re Neff, 157 Fed. 57, 84 C. C. A. 561, 28 L. R. A. (N. S.) 349; In re Swift, 112 Fed. 315, 50 C. C. A. 264; In re Stern, 116 Fed. 604, 54 C. C. A. 60; Marbury v. Kentucky Union Land Co., 62 Fed. 335, 10 C. C. A. 393; Ex parte Stapleton, L. R. 10 Ch. Div. 586; In re Fire Ins. Co., L. R. 17 Ch. Div. 337.

In the present case the appointment of the receivers for the Metropolitan and City Companies completely disabled those corporations from carrying out the contract with the Metropolitan Express Com-

pany. That contract granted the right to do the "express, freight and delivery business" on the roads of the Metropolitan system. The receivers took possession of the roads and excluded the Express Company and its assignee. Certainly there was absolute "disenablement of performance." The railway companies also practically admitted their insolvency when the receivers were appointed and joined in the prayers for their appointment.

It is clear, then, upon the authorities cited, that the contract in question was broken by the insolvency of the Railway Companies and the appointment of the receivers unless the contention of the appellees be well founded that a receivership cannot operate to break an executory contract because the receivers are allowed a period in which to act upon it.

As we have seen in the Termination of Lease Proceeding, a receiver is entitled to a reasonable time in which to determine whether to adopt or renounce the contracts of the corporation for which he is appointed. During this trial period the operations under the contract may go on and the legal consequences flowing from the fact of the receivership may be suspended in their operation. If the receiver elect to adopt the contract, his adoption relates back to the beginning of the receivership and the contract continues as if nothing had taken place. That which would otherwise have amounted to a breach of contract does not have that effect on account of the receiver's acceptance of it. On the other hand, it necessarily follows that when a receiver rejects a contract, his rejection relates back to the beginning of the receivership and the breach of the contract takes place as of that time. Any other rule would be altogether inequitable and one-sided.[14]

The further contention is made by the appellees that even if the receivership proceedings did constitute a breach of the contract, still there was no breach before that time and, consequently, no provable claim.

In view of the principles which we have already fully considered, it is unnecessary now to consider this contention or to draw distinctions between claims which accrued before, arose contemporaneously with, or followed the act of the receiver's appointment. It is sufficient that even if the breach took place after such appointment, the claim of the Express Company, when presented, was fixed and absolute. Being so, it was provable. The only uncertainty was as to the amount of damages; but the mere necessity for liquidating demands never affects their provability.

[14] It should be observed that there is no analogy between a case like the present one and the bankruptcy cases relating to leases of real estate like In re Roth & Appel, 181 Fed. 667, 104 C. C. A. 649, 31 L. R. A. (N. S.) 270. In those cases it is held that the estate in lands which passes to a lessee is not divested by his bankruptcy when the trustee does not elect to assume the lease. Under such conditions the bankrupt lessee retains the lease upon the same footing as before. In other words the situation of the leasehold interest is as if nothing had happened. The present case is more like that of the bankruptcy of a lessor whose trustee drives the tenant out of possession and then insists that the lease was never broken.

We come then to the final inquiry which is whether the Metropolitan Express Company, the claimant, has shown that it sustained any substantial damage by reason of the complete breach of the contract in question.

[8] Manifestly the claimant was entitled to recover the value of its contract. Manifestly also the value of its contract was what it would have made by its performance. Gains prevented, when fairly shown, are recoverable as damages for breach of contract. But future gains must be measured by past performance. Consequently profits under a contract for a reasonable period before its breach may be shown to establish gains prevented by its breach. These principles are clearly stated and the necessity for latitude in the reception of proof of damage are pointed out in the opinion of the New York Court of Appeals in Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 209, 4 N. E. 264, 266 (54 Am. Rep. 676):

"It is not true that a loss of profits cannot be allowed as damages for a breach of contract. Losses sustained and gains prevented are proper elements of damage. Most contracts are entered into with a view to future profits and such profits are in the contemplation of the parties and so far as they can be properly proved, they may form the measure of damages. As they are prospective, they must to some extent be uncertain and problematical, and yet on that account a person complaining of breach of contract is not to be deprived of all remedy. It is usually his right to prove the nature of his contract, the circumstances surrounding its breach, and the consequences naturally and plainly traceable to it, and then it is for the jury, under proper instructions as to the rules of damages, to determine the compensation to be awarded for the breach."

See, also, Howard v. Stilwell, etc., Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147; Anvil Mining Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814; Dickinson v. Hart, 142 N. Y. 183, 36 N. E. 801; Griffin v. Colver, 16 N. Y. 489, 69 Am. Dec. 718; Masterton v. Mayor, 7 Hill (N. Y.) 61, 42 Am. Dec. 38; Chapman v. Kirby, 49 Ill. 211; Corey v. Thames Iron Works, L. R. 3 Q. B., 181; Simpson v. London, etc., R. Co., L. R. I. Q. B., 274.

[9] In the present case it is manifest that the contract was entered into with a view to future profits. That was its object. It looked to the increase and development of the business. Although the claimant did not find the contract profitable when it operated it itself, it is apparent that it contained such elements of prospective value that a responsible corporation was willing to take it off its hands and guarantee a large profit. It appears also that this corporation actually found the contract profitable, for it made nearly $30,000 a year out of it for the three years prior to the receivership.

It may be that, standing by itself, the terms of the contract with the third person—the American Express Company—would not afford a measure of its value. The assignment might overestimate or underestimate and would not be binding. This contract, however, permitted an assignment and the fact that it was assigned at a substantial profit tended to show that it had a salable value. There was evidence of substantial damage.

It is no reason for denying the claimant damage that some years before the receivership it operated under the contract at a loss. Nor

is there any justification for limiting it to such profits as it might show that it could make under its own management. As already stated, the contract permitted assignment and it was assigned. The assignees made large profits. Prima facie they would have continued at the same rate and it was for the receivers to show that such conclusion did not follow, and that they arose from peculiar facilities of the American Express Company—as distinguished from other possible assignees—not within the contemplation of the parties when they made the agreement and authorized its assignment.

The claimant limits its claim for damages to reimbursement for its loss through the termination of the assignment agreement with the American Express Company and, consequently, the damages assessed cannot exceed such amount.

The decree (188 Fed. 339) is reversed and the case remanded with instructions to allow the claim for nominal damages and for such substantial damages as upon further hearing may be established.[15]

III. Appeal Presenting the Question Whether a Certain Claim of National Conduit & Cable Company is Provable Against the Estate of the City Company: Called the "Cable Company's Appeal."

For opinion below, see 188 Fed. 343.

On May 11, 1907, the claimant, the National Conduit & Cable Company, entered into an agreement with the City Company whereby it agreed to manufacture and deliver to the latter three different kinds of lead covered cable aggregating 205,000 feet in length. The City Company had the right to specify between the date of the agreement and July 1, 1908, what lengths of cable it desired.

The City Company, in accordance with the contract, specified for delivery, and there was actually delivered, a considerable amount of the cable, but at the time of the appointment of the receivers for the City Company, and its admitted insolvency, September 24, 1907, there remained unspecified for delivery, 116,490 feet of cable.

The Cable Company was at all times ready to perform said contract on its part. No breach of the contract on the part of the City Company took place prior to the appointment of its receivers. After that no cable was specified for delivery by any person and, on January 17, 1908, the receivers notified the claimant that they would not adopt the contract.

The damages to the claimant by reason of the breach of contract—assuming that there was one—based upon the market price at the commencement of the receivership amounted to $44,232.20.

The special master to whom the matter was referred rejected the claim as being contingent and his action was approved by the District Court.

The claimant has appealed to this court.

15 No substantial question is raised in the brief as to there being any difference in the liability of the two estates—that of the City Company and that of the Metropolitan Company—upon the contract in question and that matter is, accordingly, not discussed.

C. G. Galston, for appellant.

M. C. Fleming, for Ladd, receiver.

A. H. Masten, William M. Chadbourne, and Frederick W. Kobbe, for Joline et al., receivers.

B. S. Catchings, for tort creditors' committee.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The principles stated in the "Express Company's Appeal" are decisive of this case. The admitted insolvency of the City Company followed by the appointment of the receivers, constituted a breach of the contract which was not affected by the fact that the receivers did not notify the claimant of their rejection until some months afterwards. When the claimant was called upon to present its claim it was fixed and certain, both with respect to liability and amount.

The decree appealed from (188 Fed. 343) is reversed and the claim of the appellant to the amount of $44,232.20 is allowed.

IV. Appeal Presenting the Question Whether a Certain Claim in Behalf of the Bondholders of the Second Avenue Railroad Company is Provable against the Estate of the Metropolitan Company: Called the "Second Avenue Bondholders' Appeal."

For opinion below, see 189 Fed. 661.

On January 20, 1898, the Second Avenue Railroad Company mortgaged its property to the Guaranty Trust Company, as trustee, to secure an issue of first consolidated mortgage bonds to the aggregate amount of $7,000,000. These bonds were payable on January 1, 1948, and bore interest at the rate of 5 per cent. payable semi-annually on the 1st days of August and February in each year. Each of these bonds when issued bore the following indorsement signed by the Metropolitan Company:

"For value received, the Metropolitan Street Railway Company hereby guarantees to the trustees of the within mentioned mortgage for the benefit of the holders hereof the punctual payment of the principal of the within bond and the interest thereon at the time and in the manner specified therein and according to the tenor of the several coupons belonging thereto."

The mortgage securing said bonds contained an acceleration clause providing that in case of continued default in the payment of interest, and at the election and upon the appropriate action of a majority of the bondholders, the entire principal should at once become due and payable. This clause, however, is not of importance in the present case as counsel for the claimants state in their brief that it has been "construed by the Circuit Court, with the assent of all counsel, as relating only to the enforcement of the security of the mortgage and not to the personal liability of the mortgagor or of the Metropolitan Street Railway Company."

On January 28, 1898, the Second Avenue Company leased its entire property to the Metropolitan Company for the unexpired term of its charter and any extensions thereof for the annual rent of 8 (followed by 9) per cent. upon its capital stock. The lease referred to the execution of the aforesaid mortgage to the Guar-

anty Trust Company and contained the following assumption covenant:

"This lease is made subject to all the debts and liabilities of the party of the first part (the Second Avenue Company), except debts due or liabilities incurred to the party of the second part (the Metropolitan Company), and such debts and liabilities, except as aforesaid, and subject to the provisions and conditions of this lease, are hereby assumed and are to be paid by the party of the second part as a part of the consideration hereof, and all bonds that shall be issued by the party of the first part under the mortgage to the Guaranty Trust Company, hereinbefore referred to, when issued and disposed of, as hereinbefore provided, or as provided in said mortgage or in this lease, shall be included among the obligations which the party of the second part assumes and agrees to pay under the provisions of this lease."

The Metropolitan Company went into possession under said lease and it was lived up to by the parties thereto until the appointment of the Metropolitan receivers in October, 1907, as shown in the Termination of Lease Proceeding.

The receivers apparently continued in operation of the leased Second Avenue road from the time of the appointment until November 5, 1908, when they were directed not to adopt said lease, and shortly thereafter they surrendered possession of the leased property to a receiver for the Second Avenue Company appointed by a state court in a foreclosure proceeding.

The interest coupons on said bonds maturing February 1, 1908, were paid by the Metropolitan receivers, but the coupons payable August 1, 1908, and subsequently, have not been paid.

"No decree of foreclosure and sale has been entered in either of the suits to foreclose the Second Avenue mortgage. There is no evidence in this proceeding that the Second Avenue Company is insolvent, or that the property covered by the first consolidated mortgage of the Second Avenue Company is insufficient to pay in full the principal and interest of the bonds secured thereby." (Finding of Special Master.)

The general order for the presentation of claims against the Metropolitan estate provided that all demands should be presented to the special master on or before January 15, 1908. A special order was, however, made granting leave to file the present claim on or before March 1, 1910, and such order—unlike several orders appearing in this series of appeals—was not made nunc pro tunc and did not relate back to the time limited in the general order.

This claim, made by a committee in behalf of a large number of Second Avenue bondholders, for the payment of the principal and interest of said bonds based upon the assumption covenant in said lease and the engagement endorsed upon the bonds, was presented within the time limited to the special master who rejected it as a contingent demand and his action was approved by the District Court.

The claimants have appealed to this court.

Julien T. Davies and Brainard Tolles, for appellants.
Arthur H. Masten and W. M. Chadbourne, for Joline et al., receivers.
M. C. Fleming, for Ladd, receiver.
B. S. Catchings, for tort creditors' committee.
Richard Reid Rogers and William M. Coleman, for New York Rys. Co.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above).　If the estate of the Metropolitan Company be liable to the Second Avenue bondholders it is either:

(1) Upon the assumption covenant in the lease, or

(2) Upon the engagement endorsed upon the bonds.

[10] In the lease the Metropolitan Company assumed and agreed to pay the bonds in question and the contention is that the promise being for the benefit of the claimants, they have a right of action thereon although they are not parties to the contract. The consideration of this contention requires an examination of the right of third persons to enforce promises made for their benefit.

In England and in some of the States the rule is adhered to that the only persons who can sue upon a contract are the parties; that a third person for whose benefit a contract is made cannot maintain an action upon it.　The reason for the rule is said to be that there is no privity between the contracting party making the promise and the third person and that the consideration does not move directly from the latter.　The rule has the merit of simplicity but is calculated to permit injustice.　It is founded, too, upon wholly artificial distinctions.　There is no real and substantial reason why, if the parties to a contract recognize the interest of a third person in it and desire and intend to give him a right of action upon it, they should not be able to do so.　And the prevailing doctrine in this country is contrary to the English rule.　It is generally held, subject to qualifications, that a third person may sue upon a promise made to another for his benefit.　Sometimes the right is placed by the courts upon provisions in codes giving the "real party in interest" the right to prosecute suits.　Sometimes it is based upon the theory of a trust; the promisor being regarded as trustee for the third party.　Sometimes it is based upon the theory of agency; the promisee in the contract being considered the agent of the third party who adopts his acts in suing upon the contract.　But whatever may be the correct theory, one thing is essential to the right and that is that the third person be the real promisee—that the promise be made to him in fact although not in form.　It is not enough that the contract may operate to his benefit.　It must appear that the parties intend to recognize him as the primary party in interest and as privy to the promise.

In Austin v. Seligman (C. C.) 18 Fed. 522, Judge Wallace said:

"According to good sense and upon principle there is no reason why a person may not maintain an action upon a contract although not a party to it, when the parties to the contract intend that he may do so.　The formal or immediate parties to a contract are not always the persons who have the most substantial interest in its performance.　Sometimes a third person is exclusively interested in its fulfillment.　If the parties choose to treat him as the primary party in interest, they recognize him as a privy in fact to the consideration and promise.　And the result of the better-considered decisions is that a third person may enforce a contract made by others for his benefit, whenever it is manifest from the nature or terms

of the agreement that the parties intended to treat him as the person primarily interested." [16]

[11] Let us apply these principles in the present case. Here we have a lease in which the Metropolitan Company assumed the payment, among other things, of the bonds in question. But whether it was intended by the parties that the Metropolitan should carry out its obligation by entering into an express agree-ment with the bondholders, or whether their rights should depend upon the general provisions of the lease and the somewhat hazy legal principles governing the rights of third persons upon such provisions does not clearly appear from the instrument itself. The parties, however, placed a contemporaneous construction up-on it. The Metropolitan Company, apparently with the approval of the Second Avenue Company, indorsed its engagement up-on the bonds. The mortgage, the lease and the initial issue of bonds ought to be taken as one transaction and so regarded it seems perfectly clear that the intention of the parties was that the Metropolitan should assume the payment of the bonds by virtue of its engagement endorsed upon them. There is nothing to war-rant a finding that the Metropolitan Company intended to enter into two undertakings for the benefit of the Second Avenue bond-holders—one general and one special. And to hold it liable upon both would be to ignore the elementary rule that express covenants do away with implied ones. In our opinion, the rights of the bondholders must be enforced upon the bond indorsement and not upon the assumption covenant.

Assuming, however, that the bondholders may base their de-mand upon the assumption clause, still it does not carry us far. It appears from the authorities that such a covenant, even if ab-solute in form, will be treated as conditional. Thus in Farmers' Loan, etc., Co., v. Central Park, etc., R. Co., 193 Fed. 963, this

---

[16] The courts of New York, where the contract in question was entered into and is sought to be enforced, have shown some oscillation of opinion upon the question of the extent to which a third person may sue upon a promise for his benefit. At the present time the law as established in New York cannot be regarded as at all contrary to Judge Wallace's opinion. In-deed the New York courts repeatedly insist that a contract upon which a third party can sue, must have this benefit for its object.

In Simson v. Brown, 68 N. Y. 355 (quoted with approval in Constable v. National S. S. Co., 154 U. S. 51, 14 Sup. Ct. 1062, 38 L. Ed. 903) the Court of Appeals said:

"It is not every promise made by one to another, for the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit as its object, and he must be the party intended to be benefited."

Other New York cases upon the subject in addition to Lawrence v. Fox, 20 N. Y. 268, which formulated the broad doctrine are: Embler v. Hartford Steam Boiler Insurance Co., 158 N. Y. 431, 53 N. E. 212, 44 L. R. A. 512; Durnherr v. Rau, 135 N. Y. 222, 32 N. E. 49; Lorillard v. Clyde, 122 N. Y. 498, 25 N. E. 917, 10 L. R. A. 113; Beveridge v. New York El. R. Co., 112 N. Y. 1, 19 N. E. 489, 2 L. R. A. 648; Vrooman v. Turner, 69 N. Y. 280, 25 Am. Rep. 195.

court said in respect of an assumption provision in a lease almost identical with the present one:

"But even assuming with appellant that the lease of 1892 does contain an assumption of the Central Park Company's funded debt and assuming further, that this case is governed wholly by the law of New York as declared by its highest court, there is nothing in the evidence to show that the Metropolitan Company ever assumed any higher obligation than one to hold the Central Park Company harmless from the consequences of foreclosure, the pledged property remaining always the primary fund for the payment of the mortgage. 'The giving of a covenant by the grantee does not work a novation of the mortgage debt. It does not make the debt his own, except in respect to the estate.' Matter of Wilbur v. Warren, 104 N. Y. 198 [10 N. E. 263], citing Butler v. Butler, 5 Ves. 534."

If, then, the mortgaged property be the primary fund for the payment of the mortgage, it necessarily follows that this assumption covenant, if constituting a promise for the benefit of the mortgage bondholders, was merely a promise to pay any deficiency after exhausting the mortgage security. Granting that the promise would be for the benefit of the bondholders and that it would support a direct action by them, would not change its conditional character. The Metropolitan Company was liable to the bondholders only as it was liable to the Second Avenue Company itself. Vrooman v. Turner, 69 N. Y. 280; 25 Am. Rep. 195.

And if the bondholders had a conditional right of action upon the assumption clause, i. e., if they could have enforced the promise to pay any deficiency existing after exhausting the security of the mortgage, their demand was too uncertain when presented —and is too uncertain now—to constitute a provable claim in an equity receivership cause within the principles stated in the Express Company's Appeal. As shown in the statement of facts, no foreclosure decree has ever been entered and there is nothing to show that there ever will be any deficiency after using up the mortgage security. Assuming the assumption covenant to be enforceable, it is entirely uncertain what, if anything will ever be due upon it.

We come now to the engagement endorsed upon the bonds and are relieved from considering it in any other way than as it stands upon its face by the admission of counsel that the operation of the acceleration clause does not affect the liability of the Metropolitan Company. Its obligation is to deal with the bonds upon their maturity in 1948 and the interest for the intervening period.

[12] The engagement of the Metropolitan Company endorsed upon the bonds is in the form of a guaranty. The Second Avenue Company is the maker of the bonds and the Metropolitan Company "guarantees" the punctual payment of the principal and interest thereon "at the time and in the manner specified therein." And if the contract is what it purports to be, it is a collateral undertaking. There cannot be a guaranty—an absolute guaranty of payment or a conditional guaranty of collection—unless there be a principal liability. If there be no debt or default of a third

person, present or prospective, there can be no guaranty.[17] The Metropolitan Company then, as guarantor, is liable for the default of the Second Avenue Company, the maker, upon the bonds. But the principal of the bonds does not become due until 1948, and there cannot be any default for which the Metropolitan Company is answerable until that time. Nor can there be any default for non-payment of interest until it becomes due. If the obligation of the Metropolitan Company be that of a guarantor any claim based thereon for the principal or future interest is, at the present time, both immature and uncertain. It cannot be said with certainty that the Second Avenue Company—the principal—will default upon the bonds in 1948, or upon the future interest. Indeed, as we have seen, the special master has found that there is no evidence to show that the Second Avenue Company is insolvent. The claim for the future as based upon a contract of guaranty is, within the principles stated in the Express Company's Appeal, too uncertain for allowance.

But it is contended by the claimants that although the contract is in form to answer for the default of the Second Avenue Company, yet that its purpose is to benefit directly the Metropolitan Company, and that it should be regarded as the original undertaking of the latter of which the present worth can be ascertained by recognized methods and which can be proved against the Metropolitan estate.

[13] Notwithstanding that the word "guaranty" is used in an engagement, it may be construed to constitute an original and absolute undertaking when it is plain—but only when it is plain—that such was the intention of the parties. The difficulty in this case is that there are no facts or circumstances shown upon the record to give the contract a different aspect from that which it bears upon its face. The finding of facts of the special master and the recitals in the lease and mortgage, are all consistent with the contract being one of guaranty. There is nothing to show that the proceeds of the bonds did not go to pay the debts of the Second Avenue Company or to make improvements upon its property. Undoubtedly the Metropolitan Company benefited by the transaction as the Second Avenue Company was enabled to pay any debts owing to it. Undoubtedly it benefited also by the improvements upon the railroads which it leased. Presumably those were the reasons why it was willing to guarantee the bonds. But the facts presented are wholly insufficient to change that which appears to be a contract of guaranty into an original several or joint obligation.

For these reasons it is clear that the claim for the principal and future interest of the bonds is not provable against the Metropolitan estate because it is altogether uncertain in its nature. This

---

[17] The principle stated in the text is not affected by the rule that in the case of an absolute guaranty of payment no demand upon, notice to, or proceedings against the principal debtor may be necessary. There must be a principal debtor or there can be no guaranty.

is not true with respect to the interest coupons falling due between August 1, 1908, and March 1, 1910. These coupons had fallen due; the Second Avenue Company had defaulted upon them, and the liability of the Metropolitan Company had become fixed, certain and liquidated before the claimants were required to present their demand. When presented it was, with respect to these coupons, for a definite sum of money which the Metropolitan Company owed and, upon the principles stated in the Express Company's Appeal, was entitled to allowance. And it is particularly equitable that the claim for such coupons should be allowed because for a portion of the period covered by them the Metropolitan receivers were in possession of the leased road. Upon the principles stated in the Crosstown Company's Appeal, the lessee should have its rental during the trial period as a general claim if the receivers fail to pay it. These coupons, while representing interest as between the Second Avenue Company and its bondholders, represented rental so far as the Metropolitan Company was concerned and did not come within the interest rule stated in the Express Company's Appeal. This was recognized by the receivers themselves for they paid one of the coupons falling due after the commencement of the receivership.

It is urged, however, by the Metropolitan receivers that the claimants cannot prove their demands upon these coupons because the guaranty does not run to the bondholders themselves but to the mortgage trustee "for the benefit of the holders"; that the trustee must enforce any rights arising under it.

If this were an action at law or a suit in equity the technical objection of the want of proper parties might have weight although then we should undoubtedly conclude that the doctrine giving third persons the right to enforce promises made for their benefit counts for little if it be inapplicable in a case like this. Here, it is true, the guaranty is to the trustee but it is expressly for the benefit of the bondholder. The trustee is altogether a formal party and there are few jurisdictions where a person cannot sue when he is the beneficiary solely interested in the promise. The rule that the rights and liens of mortgage bondholders must be worked out through the trustee has reference to proceedings to enforce the security rather than to actions in personam to enforce the obligation.

But it is unnecessary in this case to determine the weight which would be attached in an action to the objection of the want of proper parties. The claimants have instituted no suits. As the real and equitable owners of the bonds and coupons they have filed their claims in an equity cause and have asked their share in the fund in the custody of the court. It makes no difference to the estate whether the dividends are paid to a trustee which then distributes to the bondholders or whether direct distribution is made. The only thing to be avoided is paying twice and there is nothing to indicate that the trustee has filed any claims. Perhaps if it had, such action would have excluded the bond-

holders from proving independently. But in the absence of action by the trustee the claimants, in our opinion, may properly prove their demands upon the coupons in question. We cannot accede to the argument that because some of the bondholders have been actionless and the trustee has taken no steps, those who have been diligent should get nothing.

The decree appealed from (189 Fed. 661) is modified so far as to provide for the allowance of the interest coupons belonging to the claimants which fell due between August 1, 1908, and February 1, 1910, inclusive; otherwise it is affirmed.[18]

On Petitions for Rehearing and for Modification of Mandate Filed by the Appellants and by the New York Railways Company, Intervener.

Julian T. Davies and Brainard Tolles, for appellants.
Arthur H. Masten, for appellees.

PER CURIAM. Our disposition of this appeal was based upon the situation of the parties as disclosed by the record and briefs. We accepted the statement of the appellants in their brief that the acceleration clause in the mortgage had been construed by the District Court with the assent of all parties as relating only to the enforcement of the mortgage and not to the liability of the mortgagor. And as error cannot be predicated upon a consent ruling, and as no different contention was made upon the hearing, we did not consider that the question of the interpretation of the clause required our examination. So, while we appreciated that the order permitting the proof of the present claim was different in form from certain other orders which appeared in this series of appeals, no explanation of such difference appeared in the record, and no question was raised at any time concerning it. Consequently we deemed that we fulfilled our full duty in applying the legal principles established to the facts as presented.

It is now urged by the appellants that they should be permitted to have a rehearing and take a different position with respect to the effect of the acceleration clause, and by the New York Railways Com-

---

[18] The special master rejected the claim upon one ground which was broad enough to exclude it altogether—principal and all interest coupons. This ground was the interpretation placed by him upon the following provision of the mortgage:

"For the debt and bonds secured hereby the railroad company is liable in personam, and any deficiency, after exhausting the mortgage security, may be enforced against the railroad company, but not against the directors and stockholders individually," etc.

The special master construed this provision as limiting the obligation of the Second Avenue Company in personam upon the bonds to the payment of the deficiency after exhausting the mortgage security, notwithstanding that the bonds themselves were absolute and unconditional. But we cannot accept this interpretation. The evident purpose of the provision was to state the exemption of directors and stockholders and to make it more acceptable by emphasizing the liability of the corporation. Moreover, to say that a debtor is liable under certain conditions is far from saying that he is not liable under other conditions.

pany, as intervener, that a rehearing should be had and the order permitting the presentation of the claim so amended as in effect to exclude the appellants' demand.

The most that can really be said in favor of these petitions for rehearing is that, if the parties had appreciated in advance the views of this court upon the different legal questions presented upon these appeals, they would probably have acted differently in the District Court, and so have presented a different record. We are not satisfied, however, that this is a good ground for rehearing, or that our conclusions reached upon the case in the manner presented were erroneous, and both petitions for rehearing must be and are denied.

We are, however, impressed with the probability that, if our decision in the Express Company's Appeal had been rendered prior to the hearing upon this claim in the District Court, the appellants would have taken a different position with respect to the construction of the acceleration clause, and it is our purpose to permit them to go back to the District Court for further hearing, if they desire to do so. But if a hearing had been had in the District Court under the conditions stated, it would have been open to the Metropolitan interests to apply for an amendment to the order permitting the presentation of the claim, and the court would have had power to grant it. Consequently, if a further hearing is to be had upon the acceleration clause in the District Court, either at the instance of the appellants or at the instance of the trustee under the mortgage, equity and fairness require that that court should have the right to amend or correct preliminary orders in the same manner as if the hearing were an original one before it.† In view of all the facts and circumstances, however, we are not satisfied that the present result of the appeal is so inequitable or unfair to other creditors that we should permit the District Court to amend the order, and so possibly exclude the appellants from any demand in absence of further action upon their part or upon the part of the trustee.

The mandate may, therefore, be recalled and amended, so as to permit the appellants to apply to the District Court for a hearing with respect to the effect of the acceleration clause, and shall further provide that in case they do so apply, or in case the trustee of the mortgage shall present the same question in any other way, our decision upon this appeal shall not prejudice the right of the District Court, for cause shown, to amend its order permitting the presentation of the claim, and shall also provide that, in case of any change in rulings or orders, the District Court shall have power to carry to a conclusion any proceedings necessary to determine the amount of the claim in view of any such change.

---

† Reference is made to possible action by the mortgage trustee only because it is suggested in the appellants' memorandum that such trustee may have the right to press a demand for the principal of the bonds independent of the appellants, but it is not intended to pass upon the rights or standing of such trustee in any way.

**V. Appeal Presenting the Question Whether Certain Claims of the Central Crosstown Railroad Company are Provable Against the Estates of the Metropolitan and City Companies: Called the "Crosstown Company's Appeal."**

For opinions below, see 192 Fed. 135; 194 Fed. 543.

On February 8, 1904, the Central Crosstown Railroad Company leased all its railroads and property to the Metropolitan Company for the term of 999 years from April 1, 1904, for the yearly rental of 15 per cent. upon its $600,000 capital stock; the agreement to pay all taxes upon its property and the amounts due under any lease or other contract, and the assumption of the interest upon its funded debt. The particularly relevant provisions of the lease are printed in the foot note.[19]

Among the obligations of the Crosstown Company of which the Metropolitan Company assumed the performance of was the obligation of the former under its lease from the Christopher Street Company, to pay "all taxes, assessments and charges which have been or may be lawfully imposed" or which the Christopher Street Company might be obligated to pay.

Nearly two years prior to the execution of the Crosstown-Metropolitan lease, on February 14, 1902, the Metropolitan Company had leased its railway system for the term of 999 years to the City Company as shown in the Termination of Lease Proceeding. This lease contained a covenant whereby the City Company agreed to pay, satisfy and discharge all taxes and, as already shown in these appeals, also contained a covenant whereby the City Company assumed the payment of all rentals and other sums of money due

---

[19] (1) The dividend rental provision of the lease is as follows:

"The lessees shall also pay to the lessor by way of rental for the railroads and property hereby demised and as part consideration for the other benefits to the lessee hereunder accruing fifteen per cent. per annum upon the existing capital stock of the lessor. * * * The rentals herein provided for are based upon the present issued capital stock of the lessor, viz.: $600,000. * * * "

(2) The interest provision is as follows:

" * * * And the lessee agrees to pay all interest upon the funded debt of the lessor and other fixed charges of the lessor, provided that the lessee shall not be required to pay the principal of any funded obligations of the lessor except as hereinafter provided."

(3) The tax provision is as follows:

"The lessee shall pay, satisfy and discharge all municipal, county, state or government taxes and assessments or other charges of any description whatever, which during the time hereby granted may be imposed upon the property hereby demised or any part thereof. * * *

"The lessee shall not, however, be required hereunder to pay any lien, tax, assessment or charge so long as it shall in good faith contest the legality and validity of the same, unless the payment thereof be necessary to protect the demised property or some part thereof from forfeiture or sale."

(4) The assumption covenant is as follows:

The "lessee shall also, from time to time, pay or cause to be paid all rentals and other sums of money which are or may be or become due and payable under or by reason of any leases or other contracts to which the lessor is a party, or to which any of the demised property is or may be subject. And the lessee hereby assumes all the obligations of the lessor under all such leases and contracts. * * * "

or payable under the lease or other contracts of the Metropolitan Company.

As already pointed out, receivers for the City Company were appointed on September 24, 1907, and for the Metropolitan Company on October 1, 1907.

The receivers, upon their appointment, took possession of the Metropolitan system, including the railroad and property included in the lease of the Crosstown Company, and operated the same, assuming the obligations of said lease with the exception of the dividend rentals and franchise taxes, until May 1, 1908, when they notified the Crosstown Company as follows:

"We have come to the conclusion, after due investigation, that the continued operation of your road under existing conditions is unprofitable, and unless the terms of the lease can be modified we shall feel it necessary for the best interests of our receivership to terminate it."

Thereupon an arrangement was made whereby the receivers were to continue the operation of the road and carry out certain provisions of the lease but were not to carry out others.

As shown in the preceding appeals, the bill for the appointment of the receivers of the City Company averred that it was insolvent and the City Company admitted the truth of the allegation and joined in the prayer for the appointment of the receivers. The petition of intervention of the Metropolitan Company averred its inability to meet its obligations and prayed that the receivership should be extended to its properties. On October 25, 1907, the City Company was formally adjudged insolvent and on November 9, 1907, a similar order was made with respect to the Metropolitan Company. Furthermore, as appears in the record in the Metropolitan Stockholders' Appeal, the special master has found that "on September 24, 1907, both the City Company and the Metropolitan Company were insolvent and unable to pay their debts or obligations."

The orders permitting the filing of the claims of the Crosstown Company for the alleged breaches of the Crosstown-Metropolitan lease against the Metropolitan and City estates provided that they might be filed not later than February 28, 1910, "nunc pro tunc as of the last day fixed by this court to file claims." The general orders referred to limited the time for the presentation of claims against the City estate to December 10, 1907, and against the Metropolitan estate to January 15, 1908.

The claims presented by the Crosstown Company against the two estates had four demands:

(1) Accrued dividend rentals under the lease;
(2) Future damages for breach of the lease;
(3) Payments for special franchise taxes;
(4) Interest on note.

The special master to whom the matter was referred disallowed all the demands with the exception of a part of the claim for franchise taxes and his action was approved by the court below.

The claimant has appealed to this court.

Other material facts are stated in the opinion.[20]

J. T. Mason, for appellant.

A. H. Masten and Ellis W. Leavenworth, for Joline et al., receivers.

M. C. Fleming, for Ladd, receiver.

Julien T. Davies and Brainard Tolles, for Second Ave. Ry. Co.

B. S. Catchings, for tort creditors' committee.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The consideration of the questions arising upon this appeal requires a review of some of the propositions which we have found established in examining the preceding appeals. Thus, we have seen that, as a general rule, insolvency accompanied by a receivership and inability to perform constitutes a breach of executory contracts. It has also been noted that bankruptcy or a receivership does not terminate a lease. Manifestly this is true because a default under a lease does not, in the absence of unusual limitations, bring it to an end unless followed by some action on the part of the lessor. Furthermore, bankruptcy or insolvency, standing alone, does not make default under an ordinary lease. When an individual lessee goes into bankruptcy and his trustee declines to adopt the lease, the lessee himself, performing the covenants, may continue to occupy. In such a case there is no inability of performance. But when an insolvent railway corporation goes into the hands of receivers and, after experimentally operating a leased road, they reject the lease, their action relates back to the commencement of the receivership and the lease would seem, for all practical purposes, to be broken as of that time. In such a case there is actually total inability of performance on the part of the shell of the lessee corporation. And if this be not a complete anticipatory breach at the commencement of the receivership, it would seem that a complete breach should be held to take place at the time when the actual default follows.

[14] These inquiries, however, belong to the law of contracts and we are not now required to press them to a conclusion. It is sufficient at this time to hold that when receivers of an insolvent lessee corporation operate a leased road for an experimental period without paying the stipulated rental and then renounce the lease, the lessor's demand for the unpaid rental during such period constitutes a general claim provable against the lessee's estate. And it makes no difference whether the claim be considered as based upon a breach of the lease relating back to the commencement of the receivership, or as founded upon equitable considerations requiring a court if it suspend a lease to experiment with it not to go further and deprive the lessor of the ordinarily tenuous right to share in the estate of an insolvent railway after its mortgages are paid.

[20] While claims are made against both the Metropolitan and City estates, we shall, as a matter of convenience, in discussing the general principles treat the demands as made against the Metropolitan alone, reserving for separate consideration at the close of the opinion the liability of the City estate.

[15] Applying these principles to the present appeal, it is manifest that the dividend rental due October 1, 1907, constituted a provable claim. It accrued while the receivers were in possession and was liquidated, fixed and certain before the expiration of the time limited for the presentation of claims. But the dividend rental due April 1, 1908, stands in a somewhat different position. As shown in the statement of facts the order permitting the claimant to present its claim was entered nunc pro tunc as of January 15, 1908. It is doubtful, upon the general principles stated in the Express Company's Appeal, whether the April rental was so certain before the expiration of the time limited as to permit the proof of a demand for it. The only uncertainty, however, was as to the length of time the receivers would take for their experimental operation. If they had been ordered in advance to operate until May 1, 1908, the claim would have been certain. As, therefore, the uncertainty arose from the action of the receivers, we think that the estate should not be permitted to take advantage of it and that the application in this case of the rule stated in the Express Company's Appeal should be modified to the extent of permitting the proof of the demand for the April, 1908, rental. But we think that no modification of the rule itself is required. We cannot conceive that a court of equity attempting in the future to follow it will decline to extend the time for the presentation of claims beyond the period of experimental operation in case it is inexpedient to order such operation for a stated period.

The period of experimental operation by the receivers terminated on May 1, 1908. After that time the receivers operated under an express agreement with the claimant. It may well be that the claimant by entering into such agreement did not waive its claims against the estate. The difficulty, however, with any demand for future damages is that in January, 1908, when the time limited for the presentation of claims against the Metropolitan estate expired, it was wholly impossible to determine the amount of damages which the claimant would sustain if the receivers renounced the lease and it was treated as broken. It was impossible then to say whether any provisional arrangement could be made for future operation by the receivers, and if it had been possible to foresee the terms of the provisional arrangement only one step would have been taken. It would have been impossible to look into the future and say what would be the result upon the conclusion of such arrangement and the surrender of the road. Who could foretell the results of operation by the owner, the growth of the city, improvements in motive power, or reductions in cost? Who could foresee whether a lease could be made to another railroad company or the terms thereof? The whole matter of future damages was and still is a matter of conjecture and guess work. The claim for such damages was properly disallowed because it was uncertain in amount and there was no method of making it certain.

[16] The special franchise tax which fell due in the year 1907, and before the expiration of the time limited for the presentation of

claims against the Metropolitan estate was provable against it. The amount of such tax was fixed. Taxes exemplify that which is certain. It is true that the lease provided that the Metropolitan should not be obliged to pay taxes so long as it contested their validity and that certiorari proceedings were carried on by the receivers to review this assessment. But these proceedings were settled and upon the principle already stated that delays caused by the receivers themselves should not prejudice creditors, the settlement should relate back to the time when the tax became a charge upon the property.[21]

The claim for future special franchise taxes—looking forward from the time which fixed the status of the Metropolitan claims, January, 1908—was, upon the principles already stated, too uncertain for allowance. This is also true of the claim for interest on the note accruing after July, 1909. These payments were required as a part of the rental and the rules which exclude a demand for future damages for nonpayment of rental exclude the claim for them.

The final inquiry is whether the City estate is liable for the demands which we have held to be provable against the Metropolitan estate.

If this inquiry were given a wide scope, it might be a complex one. It is not entirely clear to us that the transfer of the Crosstown-Metropolitan lease to the City Company by virtue of the operation of the Metropolitan-City lease, did not amount to an assignment of the term because one lease was to run two years longer than the other. Leases like these for 999 years are almost in perpetuity. They would extend to a time as remote in the future as the reign of Alfred the Great is distant in the past. To distinguish between an assignment of the term and a sub-lease upon the ground that the period between 2899 and 2901 is not covered, is to draw a very refined distinction. Furthermore, passing from privity of estate to privity of contract, the question whether the covenants in the Metropolitan City lease should be construed to be rent covenants which are limited to the duration of the lease or whether they survive it, is entitled to serious consideration. All these questions should be considered upon a complete record and when it is necessary to pass upon them. It is sufficient to dispose of this appeal to say that we are satisfied that the City estate was liable for the demands of the nature of those which we have allowed against the Metropolitan estate either through privity of estate or privity of contract up to the time of the termination of the Metropolitan-City lease and that, as pointed out in the Metropolitan Stockholders' Appeal, it is quite impossible to determine that such lease was terminated—as distinguished from being defaulted upon—prior to the time which fixed the status of the claim.

The decree appealed from (194 Fed. 543) is modified by allowing against the Metropolitan and City estates the claim for the dividend rentals due October, 1907, and April, 1908, and that for the 1907 franchise tax; and as so modified is affirmed.

[21] In making up the amount of the claim for allowance, the estate is, of course, entitled to the benefit of any reduction in the tax obtained by the claimant.

**VI.** Appeal Presenting the Question Whether the Stockholders of the Metropolitan Company Have a Valid Claim Against the Estate of the City Company for the Dividends Stipulated in the Lease: Called the "Metropolitan Stockholders' Appeal."

The lease from the Metropolitan Company to the City Company described in the Termination of Lease Proceeding was executed by the board of directors of the respective corporations with the approval of the requisite number of stockholders and contained the following provisions particularly relevant upon this appeal:

"IV. The lessee shall also pay to the lessor by way of rental for the railroads and property hereby demised and, as part consideration for the other benefits to the lessee hereunder accruing an amount equal to seven per cent. per annum upon the existing capital stock of the lessor and upon such additional capital stock of the lessor as may hereafter be issued with the written consent of the lessee as hereinafter provided. Such rental shall be paid in equal quarterly installments upon the fifteenth day of January, April, July and October of each year, beginning with the fifteenth day of July, 1902. It is the intention of the parties hereto that all of said rental shall be applied to the payment of dividends at the rate of seven per cent. per annum, payable quarterly, upon said $52,000,000 of capital stock of the lessor and upon any additional stock that may be issued with the consent of the lessee as herein provided. The lessee may at its option pay to any stockholder of the lessor the proportionate part of any quarterly installment of such rental which would be payable upon the stock held by such stockholder, and upon the written request of the lessor the lessee shall pay any such quarterly installment of rental hereunder to the stockholder of the lessor as named in a certified list thereof to be supplied by the lessor. The lessee hereby guarantees to every present and future holder of said $52,000,000 of stock of the lessor and of any additional stock of the lessor which may be issued with the consent of the lessee as herein provided, that dividends upon such stock at the rate of seven per cent. per annum shall be paid during the term of this lease in equal quarterly installments upon the days of the year aforesaid, and the lessee consents that the lessor shall issue to the holders of such stock, stock certificates which shall recite such guaranty. The lessee shall, however, be deemed to have complied with its guaranty as to any quarterly installment of said dividend if it shall pay the amount thereof to the lessor."

"XXI. In case the lessee shall fail at any time to pay the rent provided for in this indenture of lease or any part thereof, as the same shall accrue, or shall fail at any time to keep and perform any of the agreements or covenants contained in this indenture of lease, and any such default in the payment of rent or in the performance of the covenants hereof shall continue for the period of twelve months after written demand and notice from the lessor to the lessee, then and in any such case at the option of the lessor, the estate hereby demised shall cease and determine, and all right, title and interest of the lessee in the railroads and premises hereby demised and the leases hereby assigned, shall absolutely cease and determine and the lessor shall therefore become and be entitled to re-enter into and upon the railroads and premises hereby demised, and from thenceforth to have, hold, possess and enjoy the same, and every part thereof, as of first and former estate therein, anything to the contrary herein contained notwithstanding, which right shall not be affected by any waiver of a prior default by implication or agreement and no re-entry by the lessor shall impair the claims of the lessor for any rentals and other payments hereunder which shall be due and unpaid. The right of re-entry for default shall not, however, extend to any of the property hereby transferred absolutely to the lessee."

The appointment of the receivers of the City Company on September 24, 1907, and of the Metropolitan Company on October 1, 1907, their method of operating the leased property, their failure to adopt

the lease, and the appointment of a separate receiver for the City estate, are fully described in the Termination of Lease Proceeding.

The City Company, in pursuance of paragraph IV of the lease above quoted, paid, either to the Metropolitan Company or to its stockholders, the stipulated dividend rental up to July 15, 1907. Nothing has been paid since that time.

The claimants as a committee hold 14,470 shares of the Metropolitan capital stock and make a claim against the City estate based upon the obligations assumed by the City Company in said paragraph IV with respect to the payment of dividends upon such stock.

The order permitting the claimants to file this claim was entered December 21, 1910, and provided that it might be filed within 20 days thereafter "nunc pro tunc as of the 10th day of December, 1907."

The special master, to whom the claim was referred, rejected it as contingent and his action was confirmed by the District Court.

The claimants have appealed to this court.

Other material facts are stated in the opinion.

Graham Sumner, for appellants.

M. C. Fleming, for Ladd, receiver.

B. S. Catchings, for tort creditors' committee.

Julien T. Davies and Brainard Tolles, for Guaranty Trust Co.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). [17] The doctrine giving to third persons the right to enforce contracts made for their benefit, examined at length in the Second Avenue Bondholders' Appeal, is as applicable to railroad leases as to other agreements. It is conceded by the appellees that a distinct provision in a lease that the lessee shall pay directly to the stockholders of the lessor corporation as rental specified dividends upon their shares inures to their benefit and gives them individual rights of action against the lessee.[22]

The inquiry, then, is whether the provisions of this lease call for the application of these principles. The guaranty in the fourth paragraph is to "every present and future holder of" Metropolitan stock "that dividends at the rate of seven per cent. per annum shall be paid during the term of this lease," and it is stipulated that the stock certificates may bear the guaranty. The promise is made to the stockholders. They are the real promisees. Whether the guaranty be regarded as an original or a collateral undertaking upon the part of the City Company, it seems very clear that, unless modified by other provisions, it affords the Metropolitan stockholders a right of action.[23]

[22] For cases of leases providing for the payment of rentals in the form of dividends, see Ætna Ins. Co. v. Albany, etc., R. Co. (C. C.) 156 Fed. 132; McLeary v. Erie Tel., etc., Co., 38 Misc. Rep. 3, 76 N. Y. Supp. 712. See, also, Central, etc., R. Co. v. Farmers' Loan, etc., Co. (C. C.) 112 Fed. 81. Compare cases cited in following note.

[23] The appellees make the contention that the agreement contained in the fourth paragraph of the lease runs only to the Metropolitan corporation and not to its stockholders; Beveridge v. New York Elevated R. Co., 112 N. Y. 24, 19 N. E. 489, 2 L. R. A. 648; Flagg v. Manhattan R. Co. (C. C.) 10 Fed.

The appellees contend, however, that other provisions of the lease do serve to modify the guaranty and are inconsistent with its running to the stockholders. In particular it is said that the provision that the lessee shall be deemed to have complied with the guaranty as to any quarterly instalment of the dividend if it shall pay the amount thereof to the lessor nullifies it as a stockholder's guaranty. We think, however, this provision gave the lessee the option of making any quarterly payment either to the corporation or to the stockholders but that it did not relieve it of liability upon the guaranty unless it did pay to the corporation.

Let us consider the whole of paragraph IV. It (1) provided for the payment of a rental equal to 7 per cent. upon the Metropolitan's stock; (2) expressed the intention that all of the rental should be applied for the payment of dividends; (3) gave the City Company the option of paying directly to the Metropolitan stockholders; (4) guaranteed to the stockholders that dividends at the stipulated rate should be paid "during the term of this lease"; (5) provided that payments to the Metropolitan Company should be deemed to comply with the guaranty to the stockholders.

The evident purpose of these different clauses was to provide a rental sufficient to make a dividend of 7 per cent. upon the Metropolitan stock and to make sure that the Metropolitan stockholders should get it. The City Company had the option of paying to the Metropolitan corporation or to its stockholders. If it paid to the stockholders the demand of the corporation was satisfied. If it paid to the corporation the stockholders had no claim under the provision in their behalf. But if it failed to pay to either the corporation or to the stockholders then the latter had, upon the principles already examined, a right of action.

But if we assume that the stockholders had a direct right of action against the City estate, we are not carried far toward a substantial award to them. If the agreement of the City Company with the stockholders were an original one to pay them regardless of the default of their corporation, still that which they were to receive was

430, and People v. Metropolitan R. Co., 26 Hun (N. Y.) 82, being cited in support thereof.

In the cases cited the lessee in a railroad lease "guaranteed" to the lessor "an annual dividend of ten per cent. on its capital stock," that is to say that it should pay to the lessor annually a sum specified which was 10 per cent. on its capital stock. It was *held* that the so-called guaranty was one with the lessor as such and not with its individual stockholders and that such stockholders could not maintain an action upon it.

In the present case, as pointed out in the text, the guaranty is not to the lessor corporation but "to every present and future holder of said stock." The promise is made to the stockholders. They are the persons for whose benefit it was intended. The case comes within the principles discussed in the Second Avenue Bondholders' Appeal and also is well within the language of the Beveridge Case itself:

"Within the principles of adjudged cases in this court, where the plaintiff seeks to base his right to maintain his action against a third party upon a contract made between that party and another, it must be one made or intended for his benefit. Such beneficial intent must be clearly found in the agreement."

nothing more or less than rental. The City Company did not agree to pay anything other than rental either to the Metropolitan Company or to its stockholders. And upon the principle stated in the Express Company's Appeal and in the Crosstown Company's Appeal, the claim for future rentals or for future damage for failure to pay rentals, was too uncertain for allowance.[24]

[18] Let us look at the case from another viewpoint and consider the obligation of the City Company to the Metropolitan stockholders as not being an original engagement to pay rentals but as a guaranty —a collateral undertaking—that their corporation should distribute the stipulated rate. Then the important question is as to the duration of the obligation. The guaranty provision runs "during the term of this lease." Does this mean, "during the term for which the lease was made" or "during the existence of the lease"? In our opinion the latter meaning is the correct one. The former interpretation would make the City Company liable to the Metropolitan stockholders for nearly a thousand years after their corporation may have retaken the leased property and used it in other ways. An intention to hold a lessor for future payments after it has ceased to use and enjoy the thing leased—in the nature of a forfeiture—must be made very plain to be found. We do not find it plainly shown here. On the contrary, reading the different provisions of the lease together, we think it clear that the words, "term of the lease" should be construed as meaning, "existence of the lease."

We come then to the inquiry, how long *did* the Metropolitan-City lease exist? When did it terminate?

In the Express Company's Appeal, we held that the confessed insolvency of the City Company followed by its receivership constituted a breach of its contracts. In the Crosstown Company's Appeal, we pointed out that while the rule underlying such conclusion might not be altogether applicable to leases, yet that corporate railroad leases differed from leases in general. But as we further indicated the breach of a lease does not terminate it. Re-entry or other action upon the part of the lessor is necessary unless expressly waived. And, as shown in the statement of facts, this lease stipulated that a default should continue for 12 months before the lease could be terminated. What effect such provision would have in the case of complete inability to perform need not be considered here. It is sufficient for the purpose of this appeal to say that there is nothing in the record to show that this lease terminated before December 10, 1907, the time as of which the claim was filed. At that time it was problematical when the lease would terminate and altogether uncertain what the situation would be upon its termination. The claim for future damages for breach of the guaranty—viewing the agreement as one—was too uncertain for allowance.

---

[24] As the order permitting the filing of this claim was entered nunc pro tunc as of December 10, 1907, its status must be fixed as of that date and the question of certainty or uncertainty must be determined by looking into the future as of that time.

Treating the claim in question then as being either an original undertaking or a guaranty, the claimants' demand with respect to the future was not fixed and certain when presented and was properly disallowed. This is not true, however, regarding the dividend rental payable October 15, 1907. That portion of the claimants' demand was, when presented, certain both in liability and amount and should have been allowed.

The decree appealed from is modified so as to allow the demand of these claimants for their proportionate share of the dividend due October 15, 1907; otherwise it is affirmed.

### On Petition for Rehearing.

Simpson, Thacher & Bartlett and Graham Sumner, for appellants.
Richard Reid Rogers (William M. Coleman, of counsel), for appellees.

PER CURIAM. The petition for a rehearing must be denied. The decision upon the Crosstown Company's Appeal was fully considered in its relation to the present appeal, and the conclusion reached that the exceptional facts and circumstances which in that case justified a modification of the rule stated in the Express Company's Appeal did not exist in this case. As pointed out in our opinion in the Termination of Lease Proceeding, the period of real experimental operation by the City receivers continued but a very short time after the receivership.

VII. Appeal Presenting the Questions (1) Whether Certain Claims of the Metropolitan Company Against the City Company Based upon the Provisions of the Metropolitan-City Lease are Provable Against the City Estate; (2) Whether the Claims, if Provable, can be Enforced Against Such Estate to the Prejudice of its Tort and Contract Creditors: Called the "Validity of Lease Proceeding." [25]

The lease of February 14, 1902, from the Metropolitan Company to the City Company, described in the Termination of Lease Proceeding, contained the following provision which has been referred to in the foregoing appeals:

"II. The lessee shall pay, satisfy and discharge all municipal, county or government taxes and assessments, or other charges of any description what-

---

[25] While the name will be retained for convenience it is a misnomer to designate this case in its present state the "Validity of Lease Proceeding." The validity, at its inception, of the lease from the Metropolitan Company to the City Company is admitted by the appellants and there is nothing in the record to show that it became invalid afterwards. The contention is that the Metropolitan Company after the execution of the lease so controlled the City Company as to make it inequitable that the Metropolitan receivers should enforce demands based upon the lease to the prejudice of the general creditors of the City Company. But, as will appear in the opinion, this is a question of priority among creditors and not of the validity of the lease.

ever which during the term hereby granted may be imposed upon the property, hereby demised, or any part thereof, or upon any additions thereto and extensions thereof, or upon the lessor or its franchise or business by reason of the property and franchises hereby demised or by reason of any increase thereof or additions thereto or resulting from the use and operation by the lessee of the property hereby demised, or of any extension thereof or additions thereto, or from the construction of other lines in connection therewith; the intention of the parties being that the rents hereinafter agreed to be paid by the lessee shall not be in anywise impaired or diminished by any assessment, tax or charge upon the demised property real or personal, or upon any additions thereto, or extensions thereof, or upon the lessor or lessee by reason thereof. The lessee shall not, however, be required hereunder to pay any lien, tax, assessment or charge so long as it shall in good faith contest the legality and validity of the same, unless the payment thereof be necessary to protect the demised property or some part thereof from forfeiture or sale."

The receivers of the Metropolitan Company seek to enforce this provision of the lease against the estate of the City Company and the type of the charge which they have selected and which has received the consideration of the special master and of the court below, is a demand for the repayment of taxes assessed in the years 1904, 1905 and 1906 against the Ninety-Sixth Street power house of the Metropolitan Company. It appears that certiorari proceedings were taken in each year to review each assessment and that these proceedings were pending in September and October, 1907, when the receivers for the City Company and for the Metropolitan Company were appointed. These certiorari proceedings continued until February, 1909, when final judgments were rendered which reduced the assessments to a considerable extent. Thereupon the Metropolitan receivers paid the assessments and now make a claim based thereon against the City estate.

The objections to this claim made in behalf of the City estate are:

(1) That it is a contingent claim and not provable;

(2) That the Metropolitan Company and its receivers are concluded by an agreed statement of accounts from asserting the claim against the City estate; ·

(3) That the Metropolitan Company so conducted itself that its receivers are not in a position to enforce claims based upon said lease against the City estate to the prejudice of its tort and contract creditors.

The special master, whose report was confirmed by the District Court, held that the claim in question was valid and enforceable and then said:

"Nothing herein contained is an adjudication as to the effect of the facts found herein or established in this proceeding on the question of the marshaling and priority of the claims of creditors of New York City Railway Company; nor shall this determination conclude any creditor of New York City Railway Company from establishing that, or be a determination of any question as to whether they are entitled to priority of payment of·their claims out of the estate of New York City Railway Company over any other claims."

Appeals have been taken to this court in behalf of the City interests.

B. S. Catchings, for appellants.

Arthur H. Masten, W. M. Chadbourne, and Albert F. Jaeckel, for Joline et al., receivers.

Bronson Winthrop and C. T. Payne, for Farmers' Loan & Trust Co.

Julien T. Davies, and Brainard Tolles, for Guaranty Trust Co.

R. R. Rogers, for New York Railways Co.

Morgan J. O'Brien, C. E. Rushmore, and G. N. Hamlin, for contract creditors' committee.

M. C. Fleming, for Ladd, receiver.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The objection to the claim for the amount paid for taxes that it is contingent, is disposed of by the decision in the Crosstown Company's Appeal. Indeed it is not necessary to go so far as in that case, for the present claim comes squarely within the rule laid down in the Express Company's Appeal. The taxes were assessed while the City Company was operating the leased property and it was bound to pay them. Assuming that the certiorari proceedings suspended the enforcement of the demand of the municipality and assuming that the amount of the demand was uncertain until the termination of those proceedings, still it was made certain upon their termination. Then, at least, the demand became fixed and it does not appear that at that time any order had been made shutting off the presentation of claims of this nature.[26]

The claim in question is a valid one and if enforceable should be allowed against the City estate. Whether it is enforceable and if so whether it has priority over other demands are questions now to be examined.

[19] With respect to the question of enforceability it is contended in the first place that the receivers of the Metropolitan Company are estopped from urging that the City estate is indebted to them on account of the taxes paid because after the assessment thereof, in May, 1907, the two corporations settled their mutual accounts and the Metropolitan Company, by a vote of its directors, acknowledged that it had "no indebtedness for which the New York City Company is responsible."

In respect of this contention it is sufficient to say that we are satisfied that the finding of the special master is correct that the settlement in question had no relation to demands of the nature of these taxes, and that the vote regarding the existence of indebtedness referred to the heavy payments required by the lease for the floating debt and improvements, and had no reference to current charges.

In the second place, while the validity of the lease is not assailed and while no facts are presented upon which a court could hold it invalid, it is urged in behalf of the contract creditors of the City Company that while the lease at its inception may have been en-

[26] There is nothing in the record to indicate that the early general order requiring the presentation of claims had any relation to demands between the parties to the receivership cause. Indeed the order of February 11, 1911, referring the subject matter of the present claim to the special master was in effect an order allowing the presentation of the claim at that time.

forceable, yet that the Metropolitan Company and its stockholders soon obtained control over the City Company and used its earnings and assets to continue the payment of Metropolitan dividend rental and bond interest notwithstanding that the railway system was operated at a constantly increasing loss, that deficits were created, and that charges of the nature of these taxes were left unpaid and unprovided for. And it is contended that, in such circumstances, any claim of the receivers of the Metropolitan Company under the lease for such charges ought equitably to be subordinated to the payment of the claims of material, labor and supply creditors of the City Company. The contentions made in behalf of the tort creditors are broader than those of the contract creditors, but we perceive no reasons urged in their behalf upon which the court could declare the lease non-enforceable nor the claims based thereon illegitimate, and must regard such contentions as being in effect that equity requires that the Metropolitan receivers should not be permitted to recover any demands based upon the lease until the claims of the tort creditors are satisfied.

The contentions, then, in behalf of the City tort and contract creditors are for priority in payment over the Metropolitan claims in the distribution of the assets of the City Company. Were this question presented upon this appeal, we should be required to enter into an extended examination of the facts discussed upon the briefs. But we do not see that the question is presented. On the contrary, as shown in the statement of facts, the special master expressly found that all questions of priority of payments out of the estate of the City Company were outside this proceeding and the court confirmed his report. It is not for us to enter into the consideration of questions not before the court below, especially in view of the fact that the reservation in the report fully protects the creditors of the City Company in raising the question of priority in other proceedings.

The decree appealed from is affirmed.